Sarah Sims **GARRETT** et al.,
Plaintiffs,

v.

**CITY OF HAMTRAMCK, a municipal corporation, et al., Defendants.**

Civ. A. No. 32004.

United States District Court,
E. D. Michigan.

March 30, 1973.

John Ferren, Hogan & Hartson, Washington, D. C., Michael Barnhart, Detroit, Mich., for plaintiffs.

Fred Mester, Asst. U. S. Atty., Thomas C. Mayer, Detroit, Mich., Edmund E. Torcellini, Hamtramck, Mich., for defendants.

## ORDER

KEITH, District Judge.

After an extensive trial, this Court found in its opinion of November 22, 1971, 335 F.Supp. 16 (D.C.1971), that the defendants have intentionally planned and implemented a series of urban renewal projects and other government programs designed to remove a substantial portion of Black citizens from the city, in violation of plaintiffs' federal statutory and constitutional rights. Pursuant to that opinion, the Court ordered the parties to submit a proposed program designed to remedy the wrongs suffered and continuing to be suffered by virtue of defendants' conduct.

Having studied the submissions of the parties, and held hearings with respect thereto, the Court makes the following Findings of Fact in addition to those in its opinion of November 22, 1971:

1. Defendants' past actions have intentionally and unlawfully displaced at least 467 to 556 housing units occupied by Black families and individuals. These units are comprised of at least 86 from the Denton-Miller area, 34 from the Grand Haven area, 143 from the Smith-Clay (R–29) area, 183 due to Chrysler Expressway construction, and 21 from the Wyandotte (R–31) area.

2. Defendants' ongoing urban renewal activities (and other official activities related thereto) will soon be responsible for displacing at least 497 to 508 additional housing units, for which adequate replacement housing must be found. These additional units consist of at least 102 from the Denton-Miller area, 191 from the Grand Haven area, 81 from the Wyandotte area, and 123 attributable to code enforcement activities for substandard units in other areas of Hamtramck.

3. Approximately 600 of these units (described in paragraphs 1 and 2) have been or now are occupied by low and moderate income families eligible for housing subsidies under 12 U.S.C. § 1701 et seq. and 42 U.S.C. § 1401 et seq.

4. No more than 25% of these units (described in paragraphs 1 and 2) have been or are being occupied by the elderly.

5. The 964 to 1,064 housing units needed to accommodate this displaced population should consist of approximately 50% one-bedroom, 25% two-bedroom, 15% three-bedroom, 7% four-bedroom, and 3% five-bedroom units.

6. Because of the extremely low vacancy rate and the racially discriminatory and closed nature of the Hamtramck real estate market, these 964 to 1,064 replacement housing units cannot be obtained from the present private housing market in the City of Hamtramck.

7. Consistent with good planning, at least 430–440 housing units can be built in the Wyandotte (R–31) area, and at least 100–120 housing units can

be built on a site located along the extreme northeastern corner of the city between Alpena Avenue and the corporate boundary line. Very few additional housing units can be newly built in Hamtramck without clearance of existing structures.

8. For the reasons set forth in paragraph 6, the 404–534 replacement units which will be needed in addition to those constructed in the Wyandotte (R–31) and Alpena Avenue areas cannot be obtained from the present private housing market in the City of Hamtramck unless the following specific measures are taken: (a) implementation of a system to give public notice of all the residences offered for rent or sale in Hamtramck; (b) clarification of the acts which constitute discrimination under the Hamtramck Fair Housing Ordinance; (c) elimination of various exemptions from said Ordinance which presently make it ineffective; (d) implementation of a system whereby all homeowners in Hamtramck who move into new units in the Wyandotte or Alpena areas give a first option on their present homes, at a fair price, either to displacees or to the City for rehabilitation and/or resale to displacees; (e) implementation of a system which assures that when displacees who are eligible for government housing subsidies request assistance in finding a home, City officials will accompany them to inspect homes for sale or rent, and will acquaint the owners or landlords with the various applicable government subsidy programs which guaranty certain purchase or rental payments.

9. Unless there are certain rezonings, elimination of variances, and prohibitions against demolition, industrial expansion will continue to eliminate residential units in Hamtramck which are vital to maintaining the housing supply available to the plaintiff displacees.

10. Many eligible displacees will not be able to learn about and respond to their opportunity for housing in Hamtramck, pursuant to this Court's Order, unless there is an affirmative marketing strategy by which every reasonable effort is made to notify displacees personally and afford them all an equal opportunity to apply for the available housing units.

11. Many displacees will not be able to afford to move back to take advantage of their housing opportunity in Hamtramck unless they receive adequate moving expenses and other relocation payments.

In view of all the above, the Court finds that the following provisions of this Order are individually and collectively necessary to remedy the unlawful actions of defendants. Therefore,

It is hereby ordered:

I. Defendants City of Hamtramck and its officials ("city") and U.S. Department of Housing and Urban Development and its officials ("HUD") shall, after consultation with plaintiffs, design and implement an amended renewal plan for the Wyandotte Area of Hamtramck. Under such plan, the Wyandotte Area shall be devoted to maximum residential use, consistent with sound urban planning, so as to provide a source of adequate relocation housing for those individuals ("displacees") who have been and are to be displaced from their homes by urban renewal projects, and by other actions of defendants found unlawful by this Court's opinion of November 22, 1971.[1]

---

1. I. e., all Blacks who were displaced by the Smith-Clay urban renewal project, the Chrysler Expressway, the Wyandotte urban renewal project, or by code enforcement and industrial expansion in the Denton-Miller and Grand Haven-Dyar-Dequindre areas, and who were unable to relocate in decent, safe, and sanitary housing in Hamtramck; and all persons who are presently subject to displacement by a variety of governmental activities in the Wyandotte, Denton-Miller, and Grand Haven areas, as well as in other areas of the city where, for example, housing units may be removed under a comprehensive code enforcement program.

A. Such plan must provide for construction of at least 430 residential units, of which approximately 100 shall be apartment units designed for senior citizens, approximately 130 shall be apartment units for individuals and families of all ages, and approximately 200 shall be townhouses. The number of bedrooms in the different units constructed shall approximate the unit size requirements of the displaced population.

B. In administering the Wyandotte renewal plan defendants shall take all steps necessary to make maximum utilization of federal and state programs to subsidize low- and moderate-income housing.

C. If, in administering the plan, any quotas or administrative guidelines with regard to demographic makeup of tenants eligible for publicly subsidized housing programs shall conflict with maximum use of Wyandotte for displacees, defendants shall adjust or waive such quotas or guidelines.

D. To the extent that any federal or state program providing housing subsidies requires for eligibility that the Wyandotte plan be approved by the local government, or be part of the locality's "Workable Program for Community Improvement," the Wyandotte plan shall be deemed to be part of the Hamtramck Workable Program and to have received the necessary city approval.

E. To the extent that the Wyandotte renewal plan may conflict with any zoning ordinances, these ordinances shall be deemed inapplicable to the extent of any such inconsistency.

F. Defendants shall be jointly liable to make all arrangements necessary for the financing of the Wyandotte plan. The remedial plan adopted pursuant to this Court's Order shall be deemed to have been in execution since the date of this Court's Order, November 22, 1971.

G. The Proposed Amendatory Plan for Renewal of the Wyandotte Area, described in plaintiffs' proposed program filed October 10, 1972, and more fully developed in Appendix "D" thereto, is hereby adjudged consistent with the criteria enunciated in this Order.

II. Since the new units to be constructed in Wyandotte will fall far short of the number needed to accommodate the displacees, defendants shall, in consultation with plaintiffs, design and implement a plan for the seven-acre tract of land located along the extreme northeastern corner of Hamtramck between Alpena Avenue and the corporate boundary line (hereafter, the "Alpena area"). Defendants shall begin land acquisition in this area immediately, through condemnation if necessary. The plan to be developed shall utilize at least four acres of the Alpena area for residential purposes and shall provide for construction of at least 100 units.

The provisions of Sections B–F of Part I of this Order shall apply equally to the plan for the Alpena area.

III. All individuals or families who wish to rent or purchase units in the Wyandotte or Alpena areas, and who own a home in Hamtramck, shall be required, as a condition of applying for entry into the subsidized Wyandotte or Alpena developments, to sign an agreement to offer their home for sale to any willing purchaser (including the Hamtramck Housing Commission) referred by the city's relocation officials; provided, however, that (1) in no event shall the owner be obliged to accept a lesser price for his home from a purchaser referred by city relocation officials than he is offered in good faith by another bidder who does not come through relocation channels; and provided, further, that (2) the owner's obligation to give the city or displacees this "first option" shall terminate if no willing purchaser has come forward through this channel, and is prepared to close the transaction, by the date on which the owner is permitted (by his rental or purchase agreement) to move into the Wyandotte or Alpena housing unit.

There shall be the following additional conditions:

(1) If the Hamtramck Housing Commission or the city bids on the home, the price offered the seller shall not be less than the price determined by the standard HUD appraisal process.

(2) If the only bidder is someone referred by relocation officials (including the Hamtramck Housing Commission or the city itself), the owner must accept the purchase price he is offered or else forego his opportunity for a home in Wyandotte or Alpena.

(3) If there is more than one bidder, and if the Hamtramck Housing Commission or the city makes the highest bid, the seller must accept that highest bid or else forego his opportunity for a home in Wyandotte or Alpena.

(4) Any person who owns a home but (i) sells it within four months before he applies for Wyandotte or Alpena housing, without offering it for sale (as above) for relocation purposes, or (ii) otherwise attempts, through the sale of his home on the private market, to circumvent the procedures for making the previous homes of Wyandotte or Alpena residents available (as above) for relocation purposes, shall not be eligible to purchase or rent a home in Wyandotte or Alpena.

The defendant city shall bid (or arrange, if the city wishes, for the Hamtramck Housing Commission to bid) on all units which (i) are offered for sale under this mechanism, (ii) can be made suitable for relocation housing, and (iii) are not bid upon by a displacee entitled to protection under this Court's Order. HUD shall allocate sufficient funds to the city and its Housing Commission to cover the anticipated costs of such an acquisition program. The units so acquired, as well as Hamtramck housing units acquired by HUD through foreclosure or otherwise, shall be rented or sold to displaced low- or moderate-income families under appropriate rental or sales programs under federal and state law.

In connection with the foregoing bidding requirement, the defendants shall develop and promulgate joint regulations which carefully articulate the standards under which (i) a unit will be judged suitable for relocation purposes, (ii) a substandard unit which is otherwise suitable will be acquired and rehabilitated for relocation needs, and (iii) a reasonable maximim bidding price (including rehabilitation costs) will be determined. Under these regulations, units in the Denton-Miller area [2] shall not be judged suitable for relocation purposes.

IV. In order to make known to displacees the housing and benefits available pursuant to this Court's Order, defendants shall retain the services of an established private research and interviewing firm to design the details and carry out the mechanics of a notification process. This process shall comply with all the minimum requirements of a relocation assistance advisory program, as contained in 24 C.F.R. §§ 42.100–42.115 (1972) and Act No. 227, Mich.Public Acts of 1972, § 3; and, in addition, shall contain the following essential elements:

A. Periodic notices, over sustained periods of time, in the newspapers and radio stations directed especially at the Black community in the Metropolitan Detroit Area, as well as in the other, more widely received newspapers, radio, and television stations;

B. A sustained effort to trace all displacees and make personal visits to their present homes, at a time convenient to each displacee, in order to explain thoroughly the relocation opportunities, answer all questions, and fill out application forms;

C. A procedure whereby displacees can file applications directly with a central office, or give applications to the

---

2. The residential area bounded by Conant Avenue on the east, a straight line parallel to, and 180 feet south of, Denton Avenue on the south, Joseph Campau Avenue on the west, and the railroad tracks on the north.

home interviewer, who will promptly file them in the central office;

D. A mechanism for arranging inspections of floor plans and model units in the Wyandotte and Alpena developments, when available, and for inspection of units in the existing housing stock made available through the city by the "first option" mechanism in Part III of this Order.

This notification process shall not commence until final architectural plans and specifications for the housing units to be provided pursuant to this Court's Order are available to be shown to displacees.

The costs of this notification process shall be allocated between HUD and the city on a negotiated basis.

V. In order to choose from among eligible applicants for housing units made available pursuant to this Court's Order in Wyandotte, Alpena, or in units acquired by defendants from the existing housing stock, under Part III of this Order or otherwise, defendants shall establish objective rules of priority which shall provide that:

A. All eligible displacees shall share a first and equal priority as to units made available at each stage or section of development of Wyandotte or Alpena. Units from the existing housing stock, obtained by defendants pursuant to Part III of this Order or otherwise, shall be deemed part of whatever section of Wyandotte or Alpena is then available for applications. If no such section is then available, these units will be deemed a separate "section" for purposes of application priorities.

B. To the greatest extent possible, personal notice shall be given to all displacees, wherever located, as each section is opened for applications. The period of notice for each section shall be deemed to commence when the future availability of the units in each section is first announced in the public news media in the Metropolitan Detroit Area or when formal efforts to contact the displacees personally are initiated, whichever is later. The period of notice shall extend for not less than 90 days before applications for units are formally accepted, and for not less than an additional 30 days before any selection of applicants is made. The date of selection shall be not more than 60 nor less than 45 days before the units are available for occupancy. The agency which the city shall designate as responsible for accepting and processing applications will be permitted to physically receive an application during the 90-day period prior to the date when such applications can be formally accepted. All applications received during this period will be deemed to have been filed and accepted, for purposes of determining the priority of applicants for various available units, on the first day when such applications may formally be accepted (i. e., the 91st day after the notice period began). An interviewer who contacts a displacee pursuant to the notification process described in Part IV may assist the displacee in completing an application, and may physically deliver that application to the appropriate agency prior to the date upon which applications are formally accepted. All applications deemed filed on the first day for formal acceptance shall be listed in an order determined by lot.

C. The units made available in each section shall be subgrouped in appropriate categories of unit size. Eligible displacees may apply from time to time for one or more subgroups, in one or more project sections, provided that none of their preferences would be for too small or too large a unit for their needs.

D. Selection of applicants shall be made, for each subgroup of units, with strict reference to the order in which applications are filed—first come, first served. On all days except the first day of formal acceptance (see "B" above), the time as well as the date of filing shall be stamped on each application, in order to determine priority. Defendants shall promptly notify successful applicants that their request for a unit has been granted. Applicants will be given

a reasonable period of time within which to accept or reject the unit before it is offered to the next qualified applicant. Defendants shall promulgate reasonable rules which define the period of time within which an applicant must accept or reject the offer of a unit and specify the steps which the applicant must take to accept the offer.

E. If an applicant is not awarded a unit, or rejects the offer of a unit, he may apply for a suitable unit in a different or subsequently built section of development, in accordance with the foregoing procedure. Defendants shall determine whether to open all sections for application at one time, or to use a different application period for each section. If the latter approach is used, however, the notice provisions (see "B" above) shall apply to each application period.

F. Administration of this priority system shall be on a nondiscriminatory basis—to be judged, in part, by the extent of the defendants' affirmative efforts to locate Black displacees and facilitate their participation in the system for providing relocation housing units.

G. If any of the new units in a particular development section have not been taken by eligible displacees within 30 days of the date such units are ready for occupancy (see "B" above), they shall be offered to the general public—consistent with the guidelines governing the particular HUD subsidy program under which the units have been financed.

H. The defendants and the developers shall be free to negotiate how the priority system can be most effectively administered, although considerations of uniformity and centralization of information would suggest that a public agency or department be given the ultimate responsibility. Any public agency or department designated by the defendants to administer these rules of priority

may delegate by contract various responsibilities to qualified private organizations, and shall so delegate the task of tracing displacees and collecting their applications for housing units, as more fully elaborated in Part IV above.

The foregoing conditions and the rules promulgated thereunder shall be made part of a three-party contract among the city, HUD, and each developer of units on the Wyandotte and Alpena sites developed under this Order.

VI. The defendants shall initiate a thorough study and review of the residential potential of the Grand Haven area [3] to determine whether it may appropriately be used to provide relocation housing for displacees, and otherwise be developed for improved residential use. In order to preserve the status quo during this study:

A. Defendant city is hereby enjoined from undertaking any residential code enforcement in Grand Haven without providing the persons thus displaced with decent, safe, and sanitary relocation housing within the city of Hamtramck; except that, in cases of emergency where continued occupancy would be dangerous to the health and safety of the residents of the substandard units, relocation housing may be provided outside the city, if necessary, so long as it is convenient to transportation, public facilities, and the displacee's place of work;

B. Defendants shall submit for approval by this Court any proposal for rehabilitation or renewal of Grand Haven, however financed, involving any of the defendants or their agents; and

C. Until concrete plans for the area have been developed by the city (with the requisite citizen participation) and approved by the Court, the city is hereby enjoined from taking any action (a) to rezone any part of Grand Haven to an industrial or commercial category, or (b) to grant a variance for industrial or

---

3. The residential area bounded by the Chrysler Freeway on the east and south, and the corporate limits on the west and north.

commercial use in Grand Haven, or (c) to issue any building permits for non-conforming uses, or (d) to grant any demolition permits for Grand Haven (except in case of unmistakable emergency, as discussed in "A" above), or (e) to acquire or condemn any property in Grand Haven for nonresidential public use.

VII. In order to preserve the desirable residential character of areas where industrial expansion threatens to destroy further housing units needed to effectuate this Court's Order, defendants shall rezone to category R–2, permitting two-family dwellings, the following areas:

A. Buffalo Blvd. (west side), Holbrook Avenue to Comstock Avenue;

B. Conant Avenue (west side), Holbrook Avenue to Jacob Avenue;

C. Holbrook Avenue (north side), McDougall Avenue to Mitchell Avenue;

D. Carpenter Avenue (south side), Fleming Avenue to Jos. Campau Avenue;

E. Carpenter Avenue (south side), Klinger Avenue to Sobieski Avenue;

F. Grand Haven Avenue (east side), Commor Avenue to Woodland Avenue.

VIII. Until the relocation housing requirements of all eligible displacees have been met, defendants are hereby enjoined from taking any action (e. g., through condemnation, acquisition, or issuance of demolition permits), which will facilitate the elimination of housing units in the city, unless a corresponding number of new units (in addition to those built pursuant to Parts I and II of this Order) are provided within the city.

IX. In order to break down the pervasive pattern of private discrimination within the tightly closed Hamtramck housing market, defendant city shall amend its open housing ordinance, Hamtramck, Mich.Ord.No. 347 (1972), in a manner which will permit the application of the ordinance to a significant percentage of real estate transactions in Hamtramck and assure that all who seek housing in Hamtramck will have an equal opportunity to learn about and gain access to any available housing. The current Hamtramck open housing ordinance is hereby declared insufficient to accomplish those ends or to comply with this Court's prior order of November 22, 1971. The Court hereby notes for defendants' consideration and guidance that the following amendments to Hamtramck's current ordinance (or similar amendments which are equally effective in accomplishing the ends described above) would be deemed to comply with this Court's prior order of November 22, 1971:

A. The prohibited discriminatory acts (and definitions thereof) in Section 1 of said ordinance shall be specifically enumerated in a manner similar or identical to the list of unfair housing practices and relevant definitions appearing in Sections 201, 202, and 102 of the Michigan Fair Housing Act of 1968, 19 Mich.Stat.Ann. § 26.1300 (201)–(202), (102) (1970).

B. Section 2 of said ordinance shall omit the words "(2) nor to a duplex dwelling; (3) nor to a three apartment dwelling;" and thereby exempt from the ordinance's coverage only the rental of a portion of a single-family dwelling where the remaining portion of the dwelling continues to be occupied by the lessor or a member of his immediate family.

C. The ordinance shall include a provision requiring any owner or lessor of a Hamtramck housing unit to refrain from (i) offering to sell or rent that unit until he has registered his intent to do so by listing the unit with an appropriate city registry, to be established by defendant city, and from (ii) accepting any offer to buy or rent that unit until the closing of business ten business days after he has registered his intent to sell or rent the unit.

X. In order to assure that displacees obtain access on a nondiscriminatory basis to the existing private housing market in Hamtramck, defendants shall es-

tablish a procedure whereby relocation and/or public housing officials, as appropriate, (a) will accompany displacees who wish to inspect Hamtramck housing units offered for rent or sale on the open market, (b) will attempt to persuade the owner to rent or sell the unit to the displacee (on a nondiscriminatory basis); and (c) if the displacee is eligible for public housing, attempt to persuade the owner to rent or sell the unit under the applicable federal or state leased housing or acquisition program, for the benefit of low-income families.

XI. As a matter of providing complete equitable relief, in order to assure that displacees can take advantage of the relocation housing made available by this Order, defendants shall jointly adopt procedures and provide funds for adequate moving expenses and other relocation payments to displacees. The Court hereby notes for defendants' consideration and guidance that these benefits and procedures would be deemed adequate if they are patterned after those presently enumerated in the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, 42 U. S.C.A. §§ 4601–4655 (Supp.1972), as interpreted in 24 C.F.R. §§ 42.1–42.215 (1972); 37 Fed.Reg. 14768 (1972).

XII. The defendants shall assume responsibility for assuring that all displacees who are living in substandard units and express a desire to relocate, but who cannot find suitable relocation housing in Hamtramck, under the provisions of this Order or otherwise, will be provided with decent, safe, and sanitary housing in Detroit or elsewhere in the Metropolitan Area, in accordance with the criteria and provisions of 42 U.S.C.A. §§ 4625(c)(3) and 4626(a) (Supp.1972); 24 C.F.R. § 42.120 (1972) and 37 Fed. Reg. 14768 (1972); and will be provided with the relocation payments proposed for all displacees in Part XI, *supra*.

XIII. This Court shall retain jurisdiction over this matter for the entry of such further orders as may be appropriate to effectuate the provisions of this Order.