Sarah Sims **GARRETT** et al.,
Plaintiffs-Appellees,

v.

**CITY OF HAMTRAMCK**, a municipal corporation, et al., Defendants-Appellants.

Nos. 73–1862, 73–1863.

United States Court of Appeals,
Sixth Circuit.

Argued April 10, 1974.

Decided Sept. 26, 1974.

Anthony J. Steinmeyer, Dept. of Justice, Washington, D. C., for federal de-

fendants-appellants; Ralph B. Guy, Jr., U. S. Atty., Detroit, Mich., Irving Jaffe, Acting Asst. Atty. Gen., Robert E. Kopp, Atty., Dept. of Justice, Washington, D. C., on brief.

Thomas C. Mayer, Mayer & Mayer, Detroit, Mich., for municipal defendants-appellants; Edmund E. Torcellini City Atty., City of Hamtramck, James F. Nowicki, Asst. City Atty., Hamtramck, Mich., on brief.

John M. Ferren, Hogan & Hartson, Washington, D. C., for plaintiffs-appellees; Allen R. Snyder, Hogan & Hartson, Washington, D. C., Michael J. Barnhart, Center of Urban Law and Housing, Detroit, Mich., on brief.

Before LIVELY and ENGEL, Circuit Judges, and CECIL, Senior Circuit Judge.

LIVELY, Circuit Judge.

This civil rights action is concerned with the urban renewal activities of the City of Hamtramck, Michigan, which is surrounded by the City of Detroit on three sides and the City of Highland Park on the fourth, and contains slightly more than two square miles of area. It is located in a highly industrialized area with a population largely of Polish extraction. The non-white population of the City never exceeded 15 percent during the period involved in this litigation and this percentage decreased between 1960 and the trial of this action. Most of the Negro residents of Hamtramck have lived in several areas of concentration near the boundaries of the City, although some Negroes have lived at various other places throughout the City. The schools have been integrated at all times.

When the City of Hamtramck determined to undertake urban renewal, it obtained federal financing through the predecessor of the United States Department of Housing and Urban Development (HUD) which partially paid for a study and the development of a master plan. In 1959 the Vilican-Lehman (V–L) report was received by the City and adopted as its master plan of urban renewal. At this time the population of Hamtramck was approximately 37,000 and one of the basic recommendations of the V–L report was that the City engage in a planned program of population loss. By 1970 the population of Hamtramck had declined to approximately 26,400.

The first urban renewal program undertaken by the City after adoption of the master plan is referred to as the Smith-Clay Project which affected an area in the southwestern corner of the City. This was an industrialization project and involved the clearance of residences in 1962 and 1963. The program was "closed out" by HUD in 1965. A Chrysler Corporation plant has expanded into this area, replacing a blighted residential neighborhood. In about 1966 a portion of Interstate Highway 75, referred to locally as the Chrysler Expressway, was constructed on a diagonal course through the northwest corner of Hamtramck. This location for the expressway was recommended by the V–L report and the State of Michigan agreed, although two other locations had first been recommended by federal and state highway authorities. The placement of the expressway at its present location resulted in the clearance during the early 1960's of a large number of sub-standard houses from that portion of the City. It is undenied that both white and Negro residents were displaced by these two projects, with a majority of those being displaced, at least in the Smith-Clay area, being Negro.

In the mid 1960's two other industrialization projects were announced by the City. One of these is referred to as Denton-Miller and the other as Grand Haven. Denton-Miller is located in the southeast portion of the City near the Smith-Clay area, and Grand Haven consists of the area in the extreme northwest corner of the City which was cut off from the rest of the City by construction of the Chrysler Expressway. Clearance for these projects has not yet begun, though property owners in the areas have been advised that urban re-

newal is scheduled and it has been recommended that they not improve their property. At the time of the district court proceedings, HUD had neither approved nor provided financing for either Denton-Miller or Grand Haven.

In 1965 the City undertook its only urban renewal project which would result in a renewed residential area. This is known as the Wyandotte Project and originally covered 10 acres in the south central portion of the City. By amendments this project has been changed so that, as finally approved, it involves the renewal of 40 acres rather than 10. Clearance for this project was begun in 1965 and the first structures which were removed were occupied by Negroes. Many white as well as Negro residents are affected by the amended project. The failure of the amended Wyandotte plans to provide suitable replacement housing to ease the shortage of available residences for low and moderate income families affected by urban renewal led to complaints which were directed first to the City and later to HUD. On April 24, 1967 a detailed complaint was sent to HUD on behalf of the South End Improvement Association (SEIA) and other persons affected by urban renewal in Hamtramck. The complaint was made "with particular respect to the pending proposal for the amended Wyandotte Area Renewal Project (Mich.R–31)." SEIA was identified as an unincorporated association composed of residents of the Denton-Miller area. It was pointed out that the plans announced for the Denton-Miller area would result in removal of residential units and their replacement with a new school site and an area for industrial expansion. The letter asserted that SEIA "seeks to have the Wyandotte Proposal amended so as to include the construction of a substantial amount of low and middle income housing which will ease the housing shortage for low and moderate income families affected by urban renewal." It also charged that there had been a lack of compliance with federal and Michigan law in the matter of building low and moderate cost housing in the Wyandotte Project and pointed out that there was not adequate standard housing in Hamtramck to relocate persons "to be displaced" by urban renewal. There followed a recitation of experiences of former residents of the Wyandotte area who had been displaced by the project and who had failed to receive assistance from the City in finding new housing. Concern was expressed that urban renewal as carried out by the City of Hamtramck had become a program of "Negro removal." It was stated that the overall effect of urban renewal had been and would be to achieve widespread Negro removal unless low-cost housing were planned for the Wyandotte Project and elsewhere to mitigate such a trend. Approval by HUD of the amended Wyandotte plan after investigation of this administrative complaint led to the filing of the present action.

The complaint, which was filed in the district court on November 20, 1968, contains five counts. The plaintiffs are SEIA and four individuals who were displaced by the original Wyandotte Project. The complaint seeks redress for denial of rights guaranteed by the Thirteenth and Fourteenth Amendments to the United States Constitution and various civil rights laws and statutes of the United States and the State of Michigan pertaining to housing. It asserts that the plaintiffs are proceeding in a class action pursuant to Rule 23(a) and (b)(2), Fed.R. Civ.P., on behalf of the plaintiffs and others similarly situated. It is stated that SEIA represents a class composed of its members and all other Negroes living in areas affected by future urban renewal projects in the City of Hamtramck and that the four individual plaintiffs represent a class composed of Negroes who have been affected by urban renewal projects which have already been carried out by the City. It is alleged that the plaintiffs and those whom they represent will suffer irreparable injury if the City is not required to build substantial amounts of low and moderate priced public housing in the

amended Wyandotte area. The complaint charges that the City has arbitrarily and capriciously refused to provide such housing and that this has resulted in the denial to the plaintiffs and the classes they represent of due process and equal protection of the laws.

Count I of the complaint seeks redress for denial of rights guaranteed by 42 U.S.C. §§ 1981, 1982 and 1983. Count II seeks redress under Title VI of the 1964 Civil Rights Act, 42 U.S.C. § 2000d. In Count II it is alleged that the administrative complaint which was made to HUD, and its investigation of the complaint, disclosed to that agency much evidence in support of the claim that the City of Hamtramck was engaged in "Negro removal" and had failed to provide for the needs of the persons displaced by the City's urban renewal program. Count III refers to the Housing Act of 1949 and specifically the requirement of 42 U.S.C. § 1455(c) that the City provide decent, safe, sanitary dwelling for persons displaced or to be displaced from an urban renewal area and to provide a substantial number of units of standard housing in low and moderate cost ranges to serve the poor and disadvantaged of the City. It is alleged that the City has no meaningful plan of relocation for these persons. Counts IV and V seek enforcement of certain Michigan statutes related to urban renewal and housing and the court is requested to consider these counts under its pendent jurisdiction.

The prayer for relief in each of the five counts is for a declaratory judgment holding that the overall scheme of urban renewal of the City of Hamtramck violates rights guaranteed to the plaintiffs and those whom they represent and an injunction from proceeding further with urban renewal projects, particularly the amended Wyandotte Project until provision is made in the Wyandotte area for substantial amounts of low and moderate cost housing to serve those persons who have been and will be displaced by the various urban renewal projects. On January 9, 1970

plaintiffs filed an amended complaint containing a new Count VI in which it is alleged that each of the acts of the various defendants constituted an intentional denial of rights granted to plaintiffs by various constitutional and statutory provisions set forth in the original complaint.

The district court issued a number of opinions and orders in its extended consideration of this case. On March 7, 1969 it enjoined the City from proceeding with any sale or redevelopment of the property acquired through the Wyandotte Project, based on a finding that "an inadequate amount of low income housing is available within the community to meet the eventual needs of those citizens of Hamtramck to be displaced." The court further found that "in matters of relocation, especially as they pertained to the first class of plaintiffs at the time of their displacement, defendant City has not complied fully with the contractual provisions for relocation to which they are bound." The court also found that HUD had failed to make sufficient showing that its decision to take no affirmative action regarding the administrative complaints which had been made to it was reasonable. Reference to the "first class of plaintiffs" in the order is based on a preliminary statement by the court in this same opinion that two distinct classes of Negroes are represented in the suit: (1) those displaced some time in 1965 and 1966 by the "Wyandotte Area Renewal Project" and some of whom have relocated outside of the Hamtramck community, and (2) SEIA, the members of which are residents of the area scheduled for renewal in the near future. This order concluded with the court's holding that it would be premature to issue an injunction at that time resulting from the claim of the second class represented in the suit, that is, those living in areas to be affected by future renewal projects.

On November 22, 1971 the court issued another memorandum opinion and order, which is reported at 335 F.Supp.

16, and this order contains the statement that the plaintiffs "properly bring this action as a class under F.R. Civ.P. 23(b)(2) representing those Black citizens of the City of Hamtramck who have been or are scheduled to be displaced or substantially affected by urban renewal projects which have been previously implemented or which are presently planned by the defendant City." This order was entered after approximately three weeks of hearings and contained findings that the master plan resulted in a disproportionate number of black citizens being displaced by the renewal activities of the City and that the City, by way of the Smith-Clay Project, the Chrysler Expressway and the Wyandotte Project had "successfully implemented its planned population loss of Black citizens." The court further found that the same result would occur from implementation of the Denton-Miller and Grand Haven projects and that the City had actively encouraged deterioration of property in those areas by, among other activities, strictly enforcing building code regulations. It also found that the housing plan for the Wyandotte area was not intended to be responsive to the needs of black persons who had been and were being displaced by governmental activities and that residences for senior citizens and single-family residences planned for construction in the area would have sale prices far above those possible for the displaced black citizens. The court found that the federal defendants (HUD, et al.) had been involved in the "Negro removal" activities of the City by failing to insist upon adequate relocation of displaced black persons. The federal defendants were specifically held to have violated the law by failing to insist that the amended Wyandotte Project contain plans for housing within the income capabilities of the black citizens of the City and those persons dislocated by the Smith-Clay Project, the Chrysler Expressway Project and to be displaced by the Denton-Miller

Project and the Grand Haven Project. In its order, the court directed the parties to present programs within 90 days which would be designed to remedy the wrongs suffered by virtue of the illegal acts of which it found the defendants guilty.[1]

On May 1, 1972 the court entered an order in which it found that the defendants had failed to prepare a proposal in cooperation with the plaintiffs as directed and that the plaintiffs did not have resources with which to prepare such a program. The court ordered that the defendants make $25,000 available to pay a named professional for services in preparing a new plan for the Wyandotte Renewal Project in compliance with the previous court order. The order also provided for payment of $4,000 by the defendants to another professional planner and enjoined the municipal defendants "from contacting, surveying or attempting to contact and survey persons displaced or to be displaced by governmental activities in Hamtramck, until such time as the court approves a specific method for so doing or until all parties to this action approve of a specific method." Subsequent orders provided for the payment by the defendants of an additional sum in excess of $12,000 to the planners employed by the plaintiffs.

The court entered its final order, which is reported at 357 F.Supp. 925, on March 30, 1973. The order contained additional findings of fact to the effect that the past acts of the defendants had intentionally displaced at least 467 to 556 housing units occupied by black families and individuals and that the defendants would soon be responsible for displacing an additional 497 to 508 housing units for which replacement housing must be found. The court found that there was little private housing available in Hamtramck and few areas where housing could be constructed. It then directed the defendants to design and implement an amended plan for the

1. Defendants' appeal of this order was dismissed on the ground that it was not final.

Order dismissing appeal in Misc. No. 1487, 6th Cir., filed March 7, 1972.

Wyandotte area providing for maximum residential use and adequate relocation housing for displaced persons from Smith-Clay, Chrysler Expressway, Wyandotte, Denton-Miller and Grand Haven. It directed that 430 residential units be constructed in Wyandotte and specified the "mix" as between single family and multi-family residences. It also directed that all existing guidelines give way to maximum use of Wyandotte for replacement housing for persons displaced by urban renewal activities of the City and directed that all conflicting zoning provisions of the City be held inapplicable to the Wyandotte area. The court further directed that the defendants design and implement a plan for a seven-acre tract in the extreme northeast corner of the City (the Alpena area) with at least four acres of it to be developed for construction of 100 residential units.

The order contained detailed instructions with respect to the duty of present owners of residences in Hamtramck in the event they should wish to rent or buy in the Wyandotte or Alpena area and the duty of the City to bid on all houses in Hamtramck offered for sale under the provisions of the order. Criteria of priorities for new and acquired housing were set forth and the City was directed to make a thorough study and review of the residential potential of the Grand Haven area and the status quo was to be preserved by an injunction against the City from enforcing residential code provisions in that area unless replacement residences were provided for those affected. The City was further enjoined from rezoning the area for industrial purposes or granting variances, issuing building permits for non-conforming uses or granting demolition permits pending the completion of the new study. The City was directed to rezone R-2 (two family dwellings) certain designated areas and was enjoined from any activities which will eliminate housing or facilitate the elimination of housing unless corresponding numbers of new units are provided within the City.

The order further required the City to amend its open housing ordinance in order to break down the pervasive pattern of private discrimination found by the court and specified provisions which would be deemed acceptable in amending this ordinance. The defendants were further directed to jointly provide moving expenses and relocation payments for those displaced by urban renewal activities and to provide housing in the metropolitan Detroit area for displaced persons not able to obtain it in Hamtramck. All defendants have appealed from the orders of November 22, 1971, May 1, 1972, February 27, 1973 and March 30, 1973.

### The Class Action

■ The Federal Rules of Civil Procedure require that there be an early certification of a class action. F.R. Civ.P. 23(c)(1) provides:

(1) As soon as practicable after the commencement of an action brought as a class action, the court shall determine by order whether it is to be so maintained. An order under this subdivision may be conditional, and may be altered or amended before the decision on the merits.

The language of this provision is mandatory and the court has a duty to certify whether requested to do so or not. 3B J. Moore, Federal Practice, para. 23.-50 at 23–1001; Jackson v. Cutter Laboratories, Inc., 338 F.Supp. 882, 886 (E.D.Tenn.1970). The district court did not enter a separate order certifying the class action in this case. However, in the order of March 7, 1969 granting a temporary injunction against further activity in the Wyandotte area the district court stated that two distinct classes were represented in the suit and described those as being, first, residents displaced by the Wyandotte Project and second, SEIA, whose members were residents of areas in Hamtramck scheduled for renewal in the near future. The order entered November 22, 1971 after three weeks of hearings, contained a statement that the plaintiffs had

brought a class action "representing Black citizens who have been or are scheduled to be displaced or substantially affected by urban renewal projects previously implemented or presently planned." This appears to be an attempt to alter or amend the original statement which limited class representation to those removed by the Wyandotte Project and to be removed by Grand Haven and Denton-Miller.

The defendants point out that none of the plaintiffs in the action was displaced by Smith-Clay or the Chrysler Expressway Project. When persons who had been displaced by these earlier projects were presented as witnesses for the plaintiffs the defendants objected. This testimony was admitted "subject to objection." Such evidence could have been admitted for the purpose of showing past practices or a continuing method of operation with respect to the issue of intent rather than being the basis for relief to those affected by past acts. Although Smith-Clay and the Chrysler Expressway are mentioned in the complaint, the thrust of that pleading is that relief is sought for those displaced by the Wyandotte Project and to be displaced by Denton-Miller and Grand Haven. The complaint contains no allegation of discrimination in the enforcement of the building code of the City of Hamtramck and yet the final decree deals extensively with such enforcement.

On appeal the defendants state that they were not given proper notice that relief was being sought by the plaintiffs for alleged discrimination with respect to the Smith-Clay Project and the Chrysler Expressway or building code enforcement. More importantly, they claim none of the plaintiffs could properly represent those displaced in the earlier projects because they were not representatives of the class affected by those projects.

■ The plaintiffs point out that Rule 23 does not require identical conditions with respect to all members of the class if the four requirements of Rule

23(a) are fulfilled. They maintain that the plaintiffs in this action can adequately represent all black citizens displaced in the past or to be displaced from Hamtramck by its urban renewal program and that the other requirements of the rule are met. The benefit of class action treatment cannot be destroyed by dividing the class into subclasses and requiring that each sub-class be separately represented. The facts of this case, however, point out the necessity for a strict adherence to the provisions of Rule 23(c)(1). If the plaintiffs, as initiators of the class action, had moved for an early certification, the confusion which now exists could have been avoided. When the court gave its first indication of a certification in its opinion and order of March 7, 1969, the plaintiffs should have requested a clarification if the court's delineation of the classes was too narrow. They did not do so, however, and the action proceeded with the defendants entitled to assume that the only two classes represented were those displaced by the Wyandotte Project and those to be displaced by urban renewal projects which were planned for the future. The answer of HUD had denied that the plaintiffs represented the purported class and had stated that there were not common questions of law and fact and that the claims of the representatives were not typical of the class.

■■ A large portion of the relief granted in the final decree was for the benefit of persons, largely unidentified, who were displaced by the Smith-Clay and Chrysler Expressway programs. Both the City and federal defendants maintain that the equitable defense of laches applied to claims of persons displaced long before this action was filed by these two programs which were completed several years before the litigation began. Since this defense would not have been applicable to the Wyandotte, Grand Haven or Denton-Miller claims of displacement, it is the position of the defendants that persons displaced and to be displaced by these later projects could

not properly represent those persons displaced by the earlier ones since different legal issues were involved. The plaintiffs maintain that the defense of laches should have been pled affirmatively under Rule 8(c) and that under Rule 12 it was waived by the defendants. However, an examination of the complaint leads us to the conclusion that the defendants would not have been required to raise the issue of laches solely on the basis of the allegations of the complaint. It is not at all clear from the complaint that the plaintiffs were seeking any relief for persons displaced as a result of Smith-Clay and the Chrysler Expressway. These appear more properly to have been referred to in the complaint as a basis for showing a continuing policy of discrimination against low-income Negroes rather than as a basis for specific relief. The issue of laches was raised at the very beginning of the trial in the opening statement of the City, and objections on this ground were acknowledged by the trial judge. It is really unimportant whether the defendants could have succeeded on the issue of laches. The point is that the existence of this defense as to certain members of the purported class would have required separate representation for that distinct class since there was not commonality of questions of law and fact as to all parties for whom the plaintiffs eventually sought and obtained relief.

■ The defendants also argue that Grand Haven residents are not properly represented by the plaintiffs since no one living in that community is a plaintiff and SEIA strictly consists only of residents of Denton-Miller. However, the questions of law and fact relating to Denton-Miller and Grand Haven appear to be identical and the language of the complaint broadly seeks relief for all those to be displaced by proposed urban renewal projects of the future. Washington v. Lee, 263 F.Supp. 327, 330 (M.D.Ala.1966), aff'd., 390 U.S. 333, 88 S.Ct. 994, 19 L.Ed.2d 1212 (1968). The defendants were on notice from the beginning of the action that residents of both areas were included in the class which SEIA sought to represent. To hold that SEIA could not properly represent the residents of Grand Haven would be to create artificial sub-classes and thwart the purposes of Rule 23.

■ It is also asserted that none of the named plaintiffs can properly represent those persons allegedly displaced by enforcement of the city building code. None of the plaintiffs asserted that he had been displaced by code enforcement and there was slight[2] evidence that any of the housing units already eliminated were removed as a result of improper code enforcement. The district court found that 123 housing units are threatened with demolition by code enforcement, and on this basis he ordered that the City be enjoined from enforcing its building code and directed that housing be provided for the occupants of the 123 units which are threatened with demolition because of code enforcement. We have previously pointed out that there is no specific allegation in the complaint that code enforcement has resulted in any illegal displacement of Hamtramck residents. This fact alone would not prevent the granting of relief from improper code enforcement if it were otherwise proper in this action. Rule 54(c), Fed.R. Civ.P. However, it seems to us that displacement of residents by code enforcement is an issue which is separate and apart from those related to displacement by reason of urban renewal programs and was never properly before the court in this case. None of the plaintiffs is a member of the class affected by code enforcement and thus cannot act as representative of that class. Bailey v. Patterson, 369 U.S. 31, 82 S.Ct. 549, 7 L.Ed.2d 512 (1962).

We hold that the court could not properly grant relief in this action to those persons displaced by the Smith-Clay Project, the Chrysler Expressway Project or enforcement of the Hamtramck

2. A 1968 report from the mayor (Pl. Ex. 6) made general reference to code enforcement as a factor causing reduction in the nonwhite population.

building code. The defendants were entitled to proceed on the assumption (based on the court's statement in its order of March 7, 1969) that only two classes of persons were represented in the suit. The district court did not alter or amend the certification of the class action *before* the decision on the merits as provided by Rule 23(c)(1), but appears to have attempted to expand the class certification in its order of November 22, 1971 which constituted the decision on the merits. If an amendment had been made before the decision on the merits, the defendants would have had an opportunity to press the issues of laches and lack of common questions of law and fact which they had previously raised. Since the case was submitted and decided at a time when the only class action certification limited the representation by plaintiffs to members of two groups, one consisting of those affected by a presently active renewal project and the other those affected by two projects which had been announced for future implementation, relief could not in fairness be granted to persons affected by two projects long since completed. The final order of the district court must be reversed insofar as it requires affirmative action by the City to locate and provide replacement housing for those persons displaced by the Smith-Clay Project, the Chrysler Expressway Project or enforcement of the Hamtramck building code.

 We will proceed to consider the orders of the district court as they pertain to persons displaced by the Wyandotte Project and to be displaced by it and Denton-Miller and Grand Haven. A number of findings of fact are included in the court's orders and an examination of the record indicates that the underlying findings are supported by substantial evidence. The court could properly find that the Negro population of Hamtramck fell from 14.4 percent to 8.5 percent between 1960 and 1966 and that this resulted largely from implementation of the "planned program of population loss" adopted as part of the master plan of the Vilican-Lehman Report. The

record also supports the finding that the private housing market of Hamtramck was operated in a discriminatory fashion and that city officials were aware of this. There is also considerable evidence of racism and prejudice against Negroes on the part of various city officials. All Negroes living in the original Wyandotte Project area were displaced by the first urban renewal actions there, and it is clear that they received little or no relocation assistance. We also conclude that the record supports the court's finding in its order of March 30, 1973 that the City of Hamtramck has intentionally discriminated against Negro residents in violation of their constitutional and statutory rights.

 The relationship of HUD to this intentional discrimination presents a more difficult question. However, it is clear that various HUD officials were made aware of the disproportionate impact of Hamtramck's urban renewal programs on the Negro element of its population. Furthermore, HUD was advised of the non-existence of active relocation programs for persons displaced by urban renewal. The record supports a finding that HUD must have known of the discriminatory practices which pervaded the private housing market and the indications of overt prejudice among some of the persons involved in carrying out the urban renewal projects of the City. Since we have held that this action is not concerned with the completed projects or code enforcement, we have no hesitation in holding that HUD should be held responsible for the legal implementation of the ongoing Wyandotte Project and any future urban renewal projects of Hamtramck which it approves. This is especially true in view of the detailed administrative complaint which was concerned specifically with implementation of the amended Wyandotte Project.

 The district court held that both the City and federal defendants were guilty of intentional violation of a number of Michigan and federal statutes as well as the Fifth and Fourteenth Amendments. The language of the

Michigan statutes, which have not been construed by the Supreme Court of Michigan, does not appear to require the interpretation placed on these statutes by the district court. Having found constitutional violations by all defendants sufficient to warrant a broad remedy, the district court should not have exercised pendent jurisdiction to consider possible violations of these state statutes. The various federal statutes relied upon by the plaintiffs, other than 42 U.S.C. §§ 1981, 1982 and 1983, are all designed to prevent unconstitutional discrimination in urban renewal and housing programs involving federal funding. Two statutes which the court found to have been violated by the City—42 U.S.C. §§ 1455(a) and 1460(b)(1)—were not relied upon in the complaint and appear irrelevant to the ultimate holding and the relief granted. The court properly found that the City had violated 42 U.S.C. § 1455(c) which requires relocation of persons displaced by urban renewal programs. We also agree that the requirement of 42 U.S.C. § 1441 of "the development of well-planned, integrated residential neighborhoods . . ." would be violated by conversion of Denton-Miller and Grand Haven to industrial areas without providing in the expanded Wyandotte area for relocation of low-income Negroes to be displaced by such industrial expansion.

Based on the findings of fact that we have upheld, the district court properly held that HUD violated 42 U.S.C. § 2000d. Hicks v. Weaver, 302 F.Supp. 619 (E.D.La.1969). See also Shannon v. HUD, 436 F.2d 809 (3rd Cir. 1970). With respect to the Wyandotte Project the court correctly held that HUD violated 42 U.S.C. § 3608(d)(5) which requires that after 1968 the Secretary administer programs "in a manner affirmatively to further the policies of this subchapter." The subchapter referred to is the Civil Rights Act of 1968 which has as one of its purposes the assurance of fair housing practices.

The fundamental basis for the district court's disposition of this case lies in its findings of constitutional, not statutory, violations by the defendants. Only deprivation of constitutional rights would justify the far-reaching remedial provisions of the court's orders. As the Supreme Court held in Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 16, 91 S.Ct. 1267, 1271, 28 L.Ed.2d 554 (1971), rehearing denied, 403 U.S. 912, 91 S.Ct. 2200, 29 L.Ed.2d 689 (1971), "[T]he nature of the violation determines the scope of the remedy." Our study of the record in this case leads to the conclusion that the district court correctly found that the City has violated the plaintiffs' right to equal protection of the laws under the Fourteenth Amendment by engaging in activity intentionally designed to establish and add to segregation in housing patterns. Such activities have been held to be a constitutional violation. Gautreaux v. Chicago Housing Authority, 296 F.Supp. 907 (N.D.Ill.1969); Hicks v. Weaver, supra, 302 F.Supp. at 623. In view of our holding that intentional discrimination was practiced by the City there is no need to consider the doctrine of Norwalk CORE v. Norwalk Redevelopment Agency, 395 F.2d 920, 931 (2d Cir. 1968), that violation of equal protection may result from acts which are not intentional. We also conclude that the district court correctly found that HUD's permitting the Hamtramck programs to proceed after it became aware that discrimination was being practiced by the City constituted a denial of the Fifth Amendment right of due process owed to the plaintiffs. Gautreaux v. Romney, 448 F.2d 731 (7th Cir. 1971). By failing to halt a city program where discrimination in housing was being practiced and encouraged, HUD perpetuated segregation in public housing and participated in denial to the plaintiffs of their constitutional rights. This finding with respect to HUD applies, however, only to the Wyandotte Project. HUD is properly held to be jointly liable with the City for an affirmative program to eliminate discrimination from that project. Since neither the Denton-Miller nor the Grand Haven Project has been ap-

proved by HUD, or, in fact, submitted to it for approval, HUD cannot be held responsible for any wrongs suffered by the residents of these areas at the hands of the City. It may properly be enjoined, however, from providing any assistance to the City with respect to these projects unless a satisfactory plan for relocation of persons to be displaced thereby is presented to HUD and approved by it and the district court. Western Addition Community Organization v. Weaver, 294 F.Supp. 433 (N.D. Cal.1968)

### The Remedy

 As we have previously indicated, it will be necessary that this case be remanded to the district court for redetermination of the remedy provisions of its orders in the light of our holdings herein. Specifically, all provisions for determining the identities and present locations of those persons displaced by the Smith-Clay Project and the Chrysler Expressway and offering relocation housing to them must be eliminated. With respect to Denton-Miller and Grand Haven, the evidence is clear that residential units occupied by black persons have been demolished as the result of announcements by the City of its plans for future urban renewal in these areas. The City will be required to determine the identity and present locations of these displaced persons and determine whether they desire to return to Hamtramck if low and medium cost housing is offered to them in the expanded Wyandotte area. If the City proceeds with the projected programs in Grand Haven and Denton-Miller, it will be required to offer positive and effective relocation assistance to all persons displaced by these programs.

The Wyandotte Project is on a different footing. This project, having been approved by HUD after investigation following the administrative complaint of SEIA and a number of black citizens, is the joint responsibility of the City and HUD. The court was clearly correct in directing that the Wyandotte Project be primarily residential and that, in addition to providing housing for senior citizens, a majority of whom are white, the defendants have an obligation to provide low and moderate income housing in the expanded Wyandotte area for those being displaced by implementation of the Wyandotte Project itself and those who have been and will be displaced by the Denton-Miller and Grand Haven projects. The district court erred, however, in directing that final architectural plans and specifications be prepared for presentation to displaced persons before the notification of such persons begins. We believe that preliminary plans and specifications for various types of low and moderate cost housing should be prepared contemporaneously with the notification of persons eligible to occupy these units. Only after the court is advised of the number of persons desiring to have replacement housing provided in the City of Hamtramck and the needs of such persons with respect to the size of accommodations, can the court accurately direct the numbers of each type accommodation which the defendants should be required to provide.

 Part III of the final order of the district court provides for limitations on the disposition of other property in Hamtramck by those persons desiring to live in the Wyandotte area and requires the City or its housing authority to purchase residences vacated in Hamtramck by those moving to Wyandotte. The provisions of this portion of the order should remain in effect only so long as housing is needed by those displaced or to be displaced by the three projects which are subject to court action in this case. Part VI requires the City to initiate a thorough study and review of the residential potential of Grand Haven and to preserve the status quo by ceasing residential code enforcement in that area unless replacement residences are provided and from rezoning any part of the area industrial or granting variances. Part VII of the final order deals with a detailed requirement that the City rezone specific areas for residential use. Neither of these

provisions (Part VI and VII) should be included unless clearly required to guarantee the rights of plaintiffs. It appears likely that elimination of Smith-Clay and the Chrysler Expressway from consideration will result in the expanded Wyandotte area's providing sufficient low and moderate cost housing to satisfy the requirements of 42 U.S.C. § 1455 and equal protection. The affirmative provisions of the decree should be no greater than required because courts are ill-equipped to administer the details of a municipality's affairs. Norwalk CORE v. Norwalk Redevelopment Agency, *supra*, 395 F.2d at 930; Western Addition Community Organization v. Weaver, *supra*, 294 F.Supp. at 441. Part VIII of the final order which enjoins the City from any action which will eliminate housing or facilitate its elimination is properly limited to that period of time until relocation housing requirements of all eligible displacees are met. Of course, those eligible are determined by this opinion rather than the original order of the district court.

Part IX of the final order requires the City to amend its open housing ordinance in order to break down the existing pervasive pattern of private discrimination. This portion of the order contains three suggested amendments. We believe it would be a better practice to require the City to submit proposed amendments to the court for negotiation with the plaintiffs and ultimate approval by the court. Therefore the portions of the order setting forth suggested amendments will be deleted. We believe that Parts X and XI of the district court's final order properly place an affirmative duty on the defendants to assist displacees in their efforts to find replacement housing and properly require that the defendants provide moving expenses and relocation payments. Part XII should not be included unless it is shown to the satisfaction of the court that the development of the Wyandotte area primarily for residential purposes will not provide sufficient housing to meet the requirements of those displaced by Wyandotte, Grand Haven and

Denton-Miller. It is further ordered that the district court's requirement that the Alpena area be developed as a location of replacement housing be deleted from the order unless it is shown that the development of the expanded Wyandotte area will not provide all of the low and moderate cost housing required by those displaced by Wyandotte, Denton-Miller and Grand Haven. Those orders dealing with funding of efforts by plaintiffs to locate displacees and of professionally prepared plans should be reviewed by the district court in light of the reduced scope of the case.

### Jurisdictional Problems

The complaint in this case asserted a number of grounds of jurisdiction. Count I seeks redress for denial of rights guaranteed by 42 U.S.C. §§ 1981, 1982 and 1983 as well as the Thirteenth and Fourteenth Amendments, and jurisdiction is based on 28 U.S.C. §§ 1343 and 1344. It is unclear to us why Section 1344 was included. There is no jurisdiction over the City under 28 U.S.C. § 1343(3) for a civil rights action brought pursuant to 42 U.S.C. § 1983. City of Kenosha v. Bruno, 412 U.S. 507, 93 S.Ct. 2222, 37 L.Ed.2d 109 (1972). Neither the City of Hamtramck nor its planning commission is a "person" under Section 1983. We note that while the mayor of Hamtramck and the director of its urban renewal agency were made parties, the legislative body of the City is not a defendant. In its further consideration of this case the district court should determine the basis of its jurisdiction over each of the defendants and whether all of the defendants necessary for implementation of its decree are before the court. In Count III the plaintiffs assert jurisdiction under 28 U.S.C. § 1331, but the district court made no finding regarding jurisdiction of this count. See City of Kenosha v. Bruno, supra, 412 U.S. at 514, 93 S.Ct. 2222; Hague v. CIO, 307 U.S. 496, 507–508, 59 S.Ct. 954, 83 L.Ed. 1423 (1939).

In determining jurisdiction over the various defendants and the basis for holding them liable for specific affirma-

tive remedial acts, the district court must consider the opinion of this court in Mahaley v. Cuyahoga Metropolitan Housing Authority, et al., 500 F.2d 1087, (6th Cir. 1974). It is noted that the order of November 22, 1971 requiring the parties to present programs designed to remedy the wrongs is directed only to the City of Hamtramck and HUD and not to the individual defendants. To the extent that this order is based on 42 U.S.C. § 1983, it is in conflict with the holding in *Mahaley* insofar as it is directed to the City of Hamtramck.

Although it is necessary to remand for further proceedings, we note the extreme complexity of this case and that the district court correctly resolved the basic issues presented herein. The judgment of the district court is reversed and the cause remanded for further proceedings and entry of further orders consistent with the holdings set forth herein. No costs allowed.