Lucille YOUNG, et al.

v.

Samuel PIERCE, Jr., Secretary of the
Department of Housing and Urban
Development, et al.

No. P–80–8–CA.

United States District Court,
E. D. Texas,
Paris Division.

July 1, 1982.

retain jurisdiction for the purposes of entering such supplemental order.

Elizabeth Julian, East Texas Legal Services, Dallas, Tex., for plaintiffs.

William J. Cornelius, Jr., Asst. U. S. Atty., Tyler, Tex., Christine Nicholson, Dept. of Justice, Washington, D. C., for defendants.

## ORDER

JUSTICE, Chief Judge.

The above-styled civil action is brought by Lucille Young, Virginia Wyatt and Helen Ruth Jackson, charging that the United States Department of Housing and Urban Development (HUD) and certain local housing authorities in East Texas have, through policy and practice, maintained racially segregated housing in violation of the Constitution and laws of the United States. Plaintiffs Young and Wyatt are residents of Clarksville, Texas; plaintiff Jackson is a resident of Pittsburg, Texas. The three plaintiffs, all black, are applicants for public housing programs[1] in the areas of their residence. Defendants are the Secretary of HUD, the Regional Administrator of HUD responsible for the public housing programs in the relevant areas of East Texas; the Housing Authority of Clarksville and its Executive Director, and the Housing Authority of Pittsburg.

Plaintiffs claim that HUD has knowingly acquiesced in the racially discriminatory housing practices of local housing authorities in East Texas. They allege that this complicity violates the affirmative duty, incumbent on HUD as a result of certain statutes and regulations, and the United States Constitution as well, to eliminate financial participation by the federal government in illegal racial discrimination. Specifically, plaintiffs bring their action against HUD under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq., Title VIII of the Civil Rights Act of 1968, 42 U.S.C. § 3601 et seq., the Civil Rights Act of 1871, 42 U.S.C. §§ 1981 and 1982, and the Fifth Amendment to the United States Constitution. The suit against the Housing Authorities of Clarksville and Pittsburg includes claims under 42 U.S.C. § 1983, but does not include the constitutional claim.

This civil action was filed as a class action. Plaintiffs seek to represent a class of black applicants for, and residents of, HUD-assisted housing in thirty-six East Texas

---

1. The action was initially brought by Young and Wyatt against HUD and the Clarksville Housing Authority. On March 15, 1982, plaintiffs filed their motion for leave to file a First Amended Complaint. The amended complaint seeks to add Helen Ruth Jackson as a named plaintiff; additionally, plaintiffs seek to join the Housing Authority of Pittsburg, Texas, as a defendant. (Jackson is a resident of Pittsburg.) For reasons set forth in this order, the motion for leave to amend will be granted. See Rule 15(a), F.R.Civ.P. See Foman v. Davis, 371 U.S. 178, 83 S.Ct. 227, 9 L.Ed.2d 222 (1968) (leave to amend should be liberally granted).

The housing programs involved in this action are actually of three kinds—public housing, rent supplement programs, and Section 8 housing. The content of these three programs is discussed at length in this order. Infra, at pp. 1027–1028.

counties.[2] HUD strenuously opposes the certification of such a class. In addition to disputing the propriety of certifying this action as a class action pursuant to Rule 23, F.R.Civ.P., defendant HUD has raised a variety of questions which logically precede the Rule 23 inquiry. Specifically, defendant contends, first, that plaintiffs do not have a cause of action against HUD under Title VI. Second, defendant argues that plaintiffs have standing only to bring suit against the local housing authorities which allegedly have denied them housing on the basis of race. HUD first advanced its standing contention in a motion to dismiss filed May 6, 1980. This motion was denied on May 13, 1980. Shortly thereafter, HUD filed a Motion for Reconsideration of this order, in which it elaborated on its thesis that plaintiffs lack standing to challenge HUD's practices in East Texas. In addition, HUD has filed three lengthy briefs challenging the standing of plaintiffs, as well as the maintainability of this action as a class action. A hearing on the issue of class certification was held on October 30, 1981. In the course of the hearing, the parties adduced evidence concerning the Rule 23 requirements for class certification; additionally, the parties orally argued the threshold questions of the existence of a cause of action under Title VI and the standing of plaintiffs to bring suit against HUD.

In the course of the hearing and the parties' subsequent submissions in this matter, the issues of justiciability and standing have been blended with the questions of class certification. In complex actions such as this, this coalescence is understandable. Nonetheless, the issues are distinct and must be analyzed separately. Accordingly, the threshold issues of private right of action and standing will be addressed before the requirements of Rule 23.

**2.** At different points in the record of this action, plaintiffs have stated they are representing residents of 36, 38 and 39 counties. It appears that the proper scope of the action involves housing authorities in the following 36 counties: Anderson, Angelina, Bowie, Camp, Cass, Cherokee, Delta, Franklin, Gregg, Hardin, Harrison, Henderson, Hopkins, Houston, Jas-

I.

## PLAINTIFFS' CAUSES OF ACTION

A. Title VI, Civil Rights Act of 1964.

Section 601 of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, provides:

No person in the United States shall, on the ground of race, color or national origin, be excluded from participation in, denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

Title VI further creates an administrative mechanism, by which federal funding agencies are required to implement this plain principle of equality. The Act directs each federal funding agency to effectuate the provisions of § 2000d, by issuing rules, regulations, or orders of general applicability which are consistent with the underlying statute authorizing federal financial assistance. 42 U.S.C. § 2000d–1. Under § 2000d–1, federal agencies are authorized to implement the non-discrimination policy of Title VI.

by the termination of or refusal to grant or to continue assistance under such program or activity to any recipient as to whom there has been an express finding ... of a failure to comply with [the] requirement [of non-discrimination].

Further, § 2000d–1 sets forth the procedure by which such funding termination may be accomplished.

It has been clearly held that § 2000d creates a private right of action against recipients of federal funding who do not comply with the underlying principle of equality. *Bossier Parish School Board v. Lemon*, 370 F.2d 847, 852 (5th Cir. 1967). *See Cannon v. University of Chicago*, 441

per, Jefferson, Lamar, Liberty, Marion, Morris, Nacogdoches, Newton, Orange, Panola, Polk, Red River, Rusk, Sabine, St. Augustine, Shelby, Smith, Titus, Tyler, Upshur, Van Zandt and Wood. Plaintiffs contend there are 111 racially identifiable housing projects in these counties that receive federal funding.

U.S. 677, 696 & nn.20, 21, 99 S.Ct. 1946, 1957 & nn. 20, 21, 60 L.Ed.2d 560 (1979). Thus, in this civil action, it is unquestioned that plaintiffs have a valid cause of action, implied under § 2000d, against the local housing authorities which receive federal financial assistance. However, HUD argues that Title VI contemplates a dual enforcement mechanism by which the egalitarian goals of § 2000d are to be effected: (1) private suits against recipients of federal largesse; (2) the compliance processes codified in § 2000d–1, including, ultimately, the sanction of funding termination. Under this view, the two modes of enforcement are wholly separate; *i.e.*, private individuals are not permitted to interfere, in any manner, with the federal agency's enforcement proceedings; on the other hand, a suit by a private litigant challenging allegedly discriminatory conduct on the part of a local recipient of federal grant funds is not barred by agency actions directed toward federal de-funding.

This dichotomous view has received the imprimatur of two federal courts. *NAACP v. Medical Center, Inc.*, 599 F.2d 1247 (3rd Cir. 1979); *Community Brotherhood of Lynn, Inc. v. Lynn Redevelopment Authority*, 523 F.Supp. 779 (D.Mass.1981). Neither of these holdings is particularly persuasive. The finding of the Third Circuit concerning private right of action under § 2000d is relegated to a footnote, the internal logic of which is open to question. 599 F.2d at 1254, n. 27. (The conclusion "that the beneficiary may not sue the administrative agency under [§ 2000d]" does not, in any sense, "follow" from the previous premises set forth in the footnote, nor is it implicit in the Supreme Court's decision in *Cannon v. University of Chicago*, 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1977), cited as the dispositive authority for the entire discussion.[3]) The holding of the district court in

*Community Brotherhood* similarly hails *Cannon* as mandating the conclusion that no private right of action exists under § 2000d. The court quoted at length from the problematic footnote in *NAACP v. Medical Center, Inc.*, and added little more than its assent. 523 F.Supp. at 781–82.

Both the court in *Community Brotherhood*, and HUD cite *Davis v. Ball Memorial Hospital Ass'n*, 640 F.2d 30 (7th Cir. 1980), for further support. *Davis* holds that no private right of action against the federal funding agency exists under the Hill-Burton Act. 42 U.S.C. § 291 *et seq.* The opinion in *Davis* will not bear the weight of this reliance. The holding is highly conclusory in its logic, is tied closely to the particular facts of that action, and does not implicate the powerful governmental proscription of race-based discrimination.

■ Similarly, HUD's reference to the holding in *Camenisch v. University of Texas*, 616 F.2d 127 (5th Cir. 1980), is not persuasive. First, the decision in *Camenisch* has been vacated. *University of Texas v. Camenisch*, 451 U.S. 390, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981) (question of whether preliminary injunction should have been issued was moot). Second, the court's discussion of a private right of action against a federal agency took place in the context of an individual plaintiff's attempt to secure immediate relief for alleged discrimination in violation of the Rehabilitation Act of 1973, 29 U.S.C. § 794. In such a situation, the court properly concluded that "a complete cut-off of federal funds to the institution was an inappropriate result for an individual complainant." 616 F.2d at 135, citing *Cannon*, 441 U.S. at 706, n. 41, 99 S.Ct. at 1962, n.41. The logic behind this holding is simple: in *Camenisch*, the plaintiff's complaint was a single complaint against the University of Texas, for failure to comply

---

**3.** In *Cannon v. University of Chicago*, the Supreme Court found that a private right of action exists under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681. The conclusion was reached by application of the factors mandated in *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975). *Cannon* in no way settles the question of whether a private right of action against the federal funding agency is precluded by a statutorily authorized administrative complaint process. At most, *Cannon* holds that there is no private right to participate in the actual administrative decision concerning defunding under § 2000d–1. The court in *N.A.A.C.P.* milks footnote 41 of *Cannon* for far more than it is worth.

with the provisions of the Rehabilitation Act. He did not claim that HEW had systematically failed to enforce the provisions of the act, or that it had knowingly acquiesced in ongoing non-compliance by one or more recipient institutions. In view of the limited scope of the plaintiff's complaint and the restricted nature of the remedy he sought, the court properly concluded that the administrative processes for enforcement by HEW of the terms of the act were singularly inappropriate for the claim set forth in plaintiff's private suit. The court cogently summarized its rationale:

> The purpose of the administrative framework is to provide a forum in which to initiate fund termination proceedings in the event a grant recipient fails to meet its obligations. It is not intended to provide a forum for program beneficiaries to press claims of discrimination *against grant recipients.*

616 F.2d at 135 (emphasis supplied). It follows that, when an individual plaintiff seeks relief from purported discrimination *by a recipient of federal grant money* in violation of a federal statute, the appropriate avenue is a suit against the recipient. In *Camenisch,* for example, there was no question that the plaintiff had properly named the University of Texas as a defendant, in an action under § 2000d. 616 F.2d at 130–31. Such a suit might seek monetary damages, *University of Texas v. Camenisch, supra,* 451 U.S. at 398, 101 S.Ct. at 1835; additionally, equitable relief, enjoining further violations of the substantive statute, might be requested. However, such an action would not necessarily involve a claim that the federal agency distributing the grants had, itself, knowingly participated in discrimination, either actively or passively, by failing to pursue an affirmative duty.

The presence of such an allegation of dereliction *by the federal agency* wholly transforms the nature of the suit, and renders the express rationale of the *Camenisch* decision inapplicable. To the extent a plaintiff asserts that the *federal agency* is violating the terms of the federal statute, by abdicating an affirmative duty to eliminate discrimination, then the action is properly brought against the agency. In such a circumstance, the agency is a partner in discrimination, and may be held responsible for this complicity. *See, e.g., Garrett v. City of Hamtramck,* 503 F.2d 1236 (6th Cir. 1974) (HUD officials were aware of discriminatory impact of housing plan they had approved; therefore, HUD should be held responsible for violation of § 2000d. 503 F.2d at 1246–47); *Gautreaux v. Romney,* 448 F.2d 731 (7th Cir. 1971) (same standard of discriminatory conduct applies to § 2000d action against HUD as applies to § 2000d action against local housing authority. 448 F.2d at 740); *Hicks v. Weaver,* 302 F.Supp. 619 (E.D.La.1969) ("HUD sanctioned the violation of plaintiffs' rights and was an active participant since it could have halted the discrimination at any step of the program. Consequently, its own discriminatory conduct . . . is violative of 42 U.S.C. § 2000d." 302 F.Supp. at 623.)[4] *See also United States v. City of Chicago,* 395 F.Supp. 329 (N.D.Ill.1975), *aff'd* 525 F.2d 695 (7th Cir. 1975) (unpublished opinion) (Secretary of Treasury enjoined from funding municipal police department which engages in racially discriminatory employment practices); *Adams v. Richardson,* 480 F.2d 1159 (D.C.Cir.1973) (*en banc*) (HEW enjoined to begin compliance proceedings against school systems operating in violation of federal constitutional and statutory requirements. HEW must engage in "good faith performance of its general *obligation* not to allow federal funds to be supportive

---

4. HUD attempts to dismiss these three holdings as "pre-*Cannon*," and therefore not binding. There is, of course, no reason to assume that Cannon overruled these cases, *sub silentio*; nor may it be said, in any sense, that the internal reasoning of the *Cannon* decision undermines the logic of the three cases cited here. If HUD is to contend that these decisions are without value, they should support their contention with argument, rather than summary citations.

of illegal discrimination." 480 F.2d at 1166. Emphasis supplied).[5]

The logic of the decisions cited here is compelling. The specific goal of Title VI is to eliminate racial discrimination from the social fabric of the nation. The constraints of comity and federalism have presented an historical limitation on the authority of the government to pursue that ambition. However, to the extent that the federal government participates in local endeavors by allocating financial resources to them, then the federal government has a legal base from which leverage may be derived to advance the principle of racial equality. From its position of benefactor, the federal government may, under § 2000d–1, use the threat of de-funding to implement the underlying policies of Title VI.

The view that Title VI is designed merely to eliminate financial participation by the federal government in racial discrimination presents an unduly narrow portrait of the Civil Rights Act of 1964. The scope of that Act and the Congressional debates which generated it stand as ample testimony to the breadth of congressional intent behind the Act. *See, e.g.,* H.R.Rep.No.914, 1964 U.S. Code Congressional and Administrative News, p. 2391; S.Rep.No.872, *id.* at 2355. Certainly, the unarticulated premise of Title VI is that the government and private attorneys general (empowered by the private right of action implied under the Act) will, through their respective efforts, cooperatively enforce the provisions of § 2000d. Yet it is imperative to note that the implied right of private action is necessarily permissive; there is no binding obligation on private individuals victimized by discrimination in contravention of § 2000d to bring law suits challenging the proscribed conduct. On the other hand, the federal government, through its agencies, is *directed,* by the terms of the Act, to pursue the principle of racial equality. § 2000d–1. This direction is in the form of an affirmative duty to enforce the substantive rights of all persons within its intendance. Ultimately, the purpose of Title VI is to codify,

and provide further protection for, the plain "law of the land": that all persons living within the United States have a right to be treated equally with all others, without regard to race, color, or national origin. *See, e.g.,* 110 Cong.Rec. 5252 ("The existing law of the land is stated in [2000d].") (Sen. Humphrey).

The de-funding provisions of § 2000d–1 provide an explicit process by which the federal government is to effectuate this fundamental right. However, to the extent that these procedures stand as a limitation, they limit only the power of *agencies,* and they in no way undermine or compromise the breadth of the underlying principle of non-discrimination. *See* 110 Cong.Rec. at 5254 (Sen. Case); *id.* at 6562 (Sen. Kuchel). It is axiomatic that statutes will be read in such a manner that the various provisions are complementary and harmonious. To read § 2000d–1 as a limitation on the very rights that are protected by the previous section would violate this principle, and would also traduce elementary canons of logic.

The Supreme Court has plainly held that where there is a legal right, a legal remedy will exist to protect the right. *See, e.g., Jones v. Alfred H. Mayer,* 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968); *Sullivan v. Little Hunting Park,* 396 U.S. 229, 90 S.Ct. 400, 24 L.Ed.2d 386 (1969). The benefits of the affirmative duty placed on federal funding agencies, created by § 2000d, inure to all persons whose rights to equal treatment are enhanced by the positive efforts of the government. A breach of this duty, either through frank timidity or a more subtle lack of vigilance, is a violation of the underlying right, and so, *a fortiori,* is actionable. If the government fails to contribute its crucial share to the collective endeavor of eliminating discrimination, as codified in Title VI; then this failure itself amounts to a violation of that title. *See Garrett v. City of Hamtramck, supra; Gautreaux v. Romeny, supra; Hicks v. Weaver, supra.* This deprivation of the substantive

---

**5.** For discussion of *Adams v. Richardson,* see below, at p. 1024.

right to equal treatment, in contravention of § 2000d, may be redressed by a private civil action. This private right of action against the federal funding agency is implied under § 2000d, according to precisely the same logic which justifies the private right of action against the recipient of federal aid. *See e.g., N.A.A.C.P. v. Medical Center, Inc., supra,* 559 F.2d at 1253–58; *see also Cannon v. University of Chicago, supra,* 441 U.S. at 689–716, 99 S.Ct. at 1953–1967 (private right of action under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681).[6]

**B. Title VIII of the Civil Rights Act of 1968.**

■ Section 801 of Title VIII of the Civil Rights Act of 1968, 42 U.S.C. § 3601, provides:

> It is the policy of the United States to provide, within constitutional limitations, for fair housing throughout the United States.

In many respects, this simple declaration of the principle of non-discrimination is the equivalent, within Title VIII, of the policy of equality which undergirds Title VI, as enunciated in § 2000d. *See supra.* The remainder of Title VIII elaborates upon the meaning of "fair housing" as used in § 3601, and delineates, with considerable specificity, certain practices which "shall be unlawful." §§ 3604–3606. However, Title VIII substantially differs from Title VI, in the articulation of the administrative process by which the goal of racial equality is to be effected. Specifically, Title VIII contains no "pinpoint" provision similar to § 2000d–1, which severely constrains the means of enforcement available to the federal funding agency. As noted previously, § 2000d–1 sets forth elaborate and often cumbersome procedures, by which the federal funding agency seeking to enforce the

non-discrimination principle of Title VI may cut off funds to grant recipients guilty of discrimination. Even after satisfaction of the procedural prerequisites, the sanctioning power of the federal agency is limited to termination of funding "to the particular program or part thereof, in which such [discrimination] has been so found." § 2000d–1(1).

Title VIII contains no similar limitation on the enforcement powers of funding agencies acting to further the fundamental principles set forth therein. The scope of the Civil Rights Act of 1968 is majestic, and its enforcement provisions are commensurately broad. The Act was passed in recognition of the

> sordid story of which all Americans should be ashamed developed by this country in the immediate post World War II era, during which the FHA, the VA, and other Federal agencies encouraged, assisted, and made easy the flight of white people from the central cities of white America, leaving behind only the Negroes and others unable to take advantage of these liberalized extensions of credit and credit guarantees.

> Traditionally the American Government has been more than neutral on this issue. The record of the U. S. Government in that period is one, at best, of covert collaborator in policies which established the present outrageous and heartbreaking living patterns which lie at the core of the tragedy of the American city and the alienation of good people from good people because of the utter irrelevancy of color.

114 Cong.Rec. 2278 (1968) (Senator Mondale, introducing Title VIII). The "purpose or 'end' of the Federal Fair Housing Act is to remove the walls of discrimination which enclose minority groups." *Id.* at 9563 (Rep. Celler). As the Supreme Court noted in its

---

**6.** A finding that a private right of action exists under a particular decision does not, without more, entail a finding that the action in question is properly brought. Additionally, the plaintiffs must establish that they are the proper parties to bring the action. This demonstration may be placed under the general rubric of standing. In particular, plaintiffs must establish that they are among the class of persons for whose benefit the statute was passed. The standing doctrine, and its application to this action, are discussed at length, below, at pp. 1019–1025.

pathbreaking decision under Title VIII, "the reach of the proposed law was to replace the ghettos 'by truly integrated and balanced living patterns.'" *Trafficante v. Metropolitan Life Insurance Co.*, 409 U.S. 205, 211, 93 S.Ct. 364, 367, 34 L.Ed.2d 415 (1973).

In furtherance of this broad and honorable objective, Title VIII provides:

> The Secretary of Housing and Urban Development shall—
>
> \* \* \* \* \* \*
>
> (5) administer the programs and activities relating to housing and urban development in a manner affirmatively to further the policies of this title.

42 U.S.C. § 3608(d)(5).

This statute explicitly commands the Secretary of HUD to act in furtherance of the ideal of fair housing, at least so far as that goal is defined in the context of the Civil Rights Act. A variety of cases have explicitly recognized this affirmative duty. As stated by the Court of Appeals for the Second Circuit, § 3608(d)(5) requires that

> [a]ction must be taken to fulfill, as much as possible, the goal of open, integrated housing patterns, and to prevent the increase of segregation, in ghettos, of racial groups whose lack of opportunities the Act was designed to combat.

*Otero v. New York City Housing Authority*, 484 F.2d 1122, 1133 (2nd Cir. 1973); *accord: Shannon v. HUD*, 436 F.2d 809 (3rd Cir. 1970); *Banks v. Berk*, 341 F.Supp. 1175 (N.D.Ohio 1972); *Blackshear Residents Org. v. Housing Authority of Austin*, 347 F.Supp. 1138 (W.D.Tex.1971); *Sadler v. 218 Housing Corp.*, 417 F.Supp. 348 (N.D.Ga.1976); *King v. Harris*, 464 F.Supp. 827 (E.D.N.Y.1979), *aff'd* 614 F.2d 1288 (2nd Cir. 1980), *vacated on other grounds*, 446 U.S. 905, 100 S.Ct. 1828, 64 L.Ed.2d 256 (1980); *Resident Advisory Board v. Rizzo*, 429 F.Supp. 222 (E.D. Pa.1977), 425 F.Supp. 987 (E.D.Pa.1976), *aff'd on other grounds*, 564 F.2d 126 (3rd Cir. 1977), *cert. denied*, 435 U.S. 908, 98 S.Ct. 1457, 1458, 55 L.Ed.2d 499 (1978). *See also Cole v. Lynn*, 389 F.Supp. 99 (D.D.C. 1975).

In view of the clarity of this duty, it seems axiomatic that violations of it through inaction or indolence must be actionable. Failure of HUD "affirmatively to further the policies of [Title VIII]" is illegal in a fundamental sense. An agent of the federal government is no more at liberty to flout federal law than is a state governmental unit, or a private citizen. *United States v. Nixon*, 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974); *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). A private person victimized by an illegal act of the federal government may seek redress, by means of legal action against the offending governmental unit.

Viewed another way, the failure of HUD to perform its legal duties mandated by § 3608(d)(5) constitutes a discriminatory housing practice, in itself. Title VIII is founded on the irrefutable premise that the prevailing structure of the housing market in this country bears the stamp of a long history of discrimination in all forms of social life. Present housing allocation is distorted, both by the after-effects of legally sanctioned racial discrimination, and by the enduring prevalence of discrimination, despite a "complete arsenal of federal authority" aimed at eradicating it. *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 417, 88 S.Ct. 2186, 2191, 20 L.Ed.2d 1189 (1968). The Supreme Court has acknowledged the "enormity of the task of assuring fair housing," *Trafficante, supra*, 409 U.S. at 211, 93 S.Ct. at 367. In view of the scope of the mission, the "main generating force must be private suits in which ... the complainants act not only on their own behalf but also 'as private attorneys general in vindicating a policy that Congress considered to be of highest priority.'" *Id.* The Attorney General is charged with enforcing the law against all persons, including federal agencies. *United States v. Nixon, supra.* Similarly, the concept of private attorneys general vindicating Congressional policy logically extends to suits brought to insure that federal agencies comply with their explicit duties created by statute. For this purpose,

then, a private right of action exists against HUD for violation of its affirmative duties under § 3608(d)(5).

**C. Civil Rights Act of 1866, 42 U.S.C. §§ 1981 & 1982.**

■ Plaintiffs also seek relief under the post-bellum Civil Rights statutes, 42 U.S.C. §§ 1981 and 1982. Broadly put, these statutes were passed to further the principle of racial equality embodied in the Thirteenth Amendment. *Jones v. Alfred H. Mayer, supra.* The statutes provide that all persons within the jurisdiction of the United States shall have equal rights to "make and enforce contracts," (§ 1981), and "to lease real property," (§ 1982). The prohibitions of these sections plainly apply to any racial discrimination in the sale or rental of property. *Jones v. Mayer, supra; Stevens v. Dobs,* 483 F.2d 82 (4th Cir. 1973); *Williams v. Matthews Co.,* 499 F.2d 819 (8th Cir. 1974), *cert. denied,* 419 U.S. 1021, 95 S.Ct. 495, 42 L.Ed.2d 294 (1974). Actions under this section may properly be brought against federal agencies which have allegedly contravened the guarantee of equal treatment. *Penn v. Schlesinger,* 490 F.2d 700 (5th Cir. 1973); *Baker v. F & F Investment Co.,* 489 F.2d 829 (7th Cir. 1973) (*overruled on other grounds, Beard v. Robinson,* 563 F.2d 331 (7th Cir. 1977)). Whether the action or inaction of HUD, as alleged by plaintiffs in this action, constitutes a violation of the statutes is a factual matter that must be determined after trial; plainly, though, the statutes provide a cause of action for racially discriminatory conduct. This suit is properly brought under §§ 1981 and 1982.

**D. Fifth Amendment of the United States Constitution.**

■ Finally, plaintiffs contend that action or inaction of HUD in relation to the maintenance of public housing in East Texas violates the rights secured to them by the Fifth Amendment of the United States Constitution. It is beyond doubt that the due process clause of that amendment incorporates the constitutional guarantee of racial equality. Any classification that violates the equal protection clause of the Fourteenth Amendment similarly offends the Fifth Amendment. *Richardson v. Belcher,* 404 U.S. 78, 81, 92 S.Ct. 254, 257, 30 L.Ed.2d 231 (1972); *Johnson v. Robison,* 415 U.S. 361, 364 n.4, 94 S.Ct. 1160, 1164 n.4, 39 L.Ed.2d 389 (1974). A cause of action against federal officials to redress alleged discrimination may be implied directly under the Fifth Amendment. *Davis v. Passman,* 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979) (gender discrimination). If the actions of HUD here implicated would constitute racial discrimination in violation of the guarantees of the Fourteenth Amendment, relief may be granted plaintiffs directly under the Fifth Amendment.

## II.

### STANDING

Defendant HUD has advanced, at several different times in the course of this litigation, the argument that plaintiffs lack standing to bring the present action, at least as presently structured. HUD has conceded that plaintiffs Young and Wyatt have standing to challenge the practices of the Clarksville Housing Authority. Presumably, this concession implicitly acknowledges, as well, that plaintiff Jackson may properly challenge the local policies of the Pittsburg Housing Authority. However, HUD strenuously challenges the validity of the charges brought against HUD, and the propriety of residents of Clarksville challenging the practices of local housing authorities in other areas of East Texas. In large measure, all of HUD's arguments against the maintainability of the present action have been incorporated into the general rubric of standing. Among the various contentions set forth in HUD's submission in this relation are the arguments concerning private rights of action under Title VI, previously addressed. Also, a number of arguments concerning the maintainability of this action as a class action are set forth, specifically, challenges to the commonality and typicality of the claims of the named plaintiffs.

This coalescence of the legal arguments of HUD in relation to the legal structure of this action is understandable. The doctrine of standing historically has presented enormous problems in logic and elaboration. Typically, a number of issues which are not "standing" issues technically have been subsumed under that heading, for analytical convenience. *See, e.g., Joint Anti-Fascist Refugee Committee, Inc. v. McGrath*, 341 U.S. 123, 150–157, 71 S.Ct. 624, 637–641, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring); *see generally* Hart and Wechsler, The Federal Courts and the Federal System, 150–183 (1973). The standing doctrine has its jurisprudential roots in the "case or controversy" requirement of Article III. Perhaps for reasons of common origin, standing has been fused with considerations of ripeness, justiciability, reviewability, finality, or mootness, all of which are derived from Article III. Nonetheless, each concept is logically discrete; the distinct character of each doctrine is important, not merely for intellectual precision, but, more importantly, because the ultimate ability of plaintiffs to vindicate their rights depends on the resolution of these questions in a proper and logical manner.

Article III "standing", as it relates to the present action, may be reduced to two fundamental considerations: The first is whether the action challenged by plaintiffs is properly subject to judicial review, through litigation. This branch of standing is, in substance, part of the justiciability question of Article III. Nonetheless, in cases such as the present action, the question of reviewability is closely aligned with standing. The claim of defendants is that HUD's actions with respect to federal funding of housing are beyond judicial review, except insofar as the suit is brought under the Administrative Procedure Act. 5 U.S.C. § 701 *et seq.* Such a review would evaluate HUD's decisions in this relation under the familiar "arbitrary and capricious" standard. (*See* HUD's post-hearing brief, p. 12.) Alternatively, the argument, in its more extreme form, suggests that agency action with respect to funding decisions is conclusive, and thus beyond judicial

challenge by anyone. *Barlow v. Collins*, 397 U.S. 159, 169 n.2, 90 S.Ct. 832, 839 n.2, 25 L.Ed.2d 192 (1970).

These claims have been resolved by the previous discussion of the availability of a private right of action under the various statutes and constitutional clauses discussed above. HUD's funding decision may be characterized legitimately as administrative decisions; however, these decisions are made and effected under the aegis of statutes that, as analyzed above, create substantive rights which may be vindicated through litigation. As the Supreme Court has plainly said, "Congress may enact statutes creating legal rights, the invasion of which creates standing, even though no injury would exist without the statute." *Linda R. S. v. Richard D.*, 410 U.S. 614, 617 n.3, 93 S.Ct. 1146, 1148 n.3, 35 L.Ed.2d 536 (1973) citing *Trafficante supra*, 409 U.S. at 212, 93 S.Ct. at 368 (1973) (White, J., concurring). Thus, in view of the previous finding as to private rights of action, plaintiffs' claims satisfy the first portion of the "standing" requirement.

The second, and more searching, inquiry mandated by Article III standing considerations relates to whether the particular plaintiffs bringing the action are the proper persons to be contesting the actions of defendant. *Flast v. Cohen*, 392 U.S. 83, 99–100, 88 S.Ct. 1942, 1952, 20 L.Ed.2d 947 (1968). As the Supreme Court has said, the core of the question of standing is whether the party seeking relief has "alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult ... questions." *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962).

The Supreme Court, and also the lower courts, have had extraordinary difficulty articulating a cogent and manageable standard for implementing this relatively abstract concern. Every term of the court has generated an attempt to clarify the doctrine, typically without notable success.

*See,* most recently, *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* —— U.S. ——, ——–——, 102 S.Ct. 752, 757, 65, 70 L.Ed.2d 700 (1982). From these decisions, a variety of precepts may be garnered which collectively shed some light on the question of standing. The origin of these axioms is not plain. As Justice Rehnquist stated in *Valley Forge,* "it has not always been clear in the opinions of this Court whether particular features of the 'standing' requirement have been required by Art. III *ex proprio vigore,* or whether they are requirements that the Court itself has erected and which were not compelled by the language of the Constitution." —— U.S. at ——, 102 S.Ct. at 758. In *Trafficante,* the Supreme Court concluded that, under Title VIII, Congress intended to define standing as broadly as is permitted by Article III of the Constitution. 409 U.S. at 209, 93 S.Ct. at 366. This holding was qualified as applying only "insofar as tenants of the same housing unit that is charged with discrimination are concerned." *Id.* This limitation, though important, does not bear on the present discussion of standing; it will be addressed below, with respect to defendant HUD's contentions concerning typicality and commonality. Of importance here is the plain conclusion that any judicially imposed standing requirements, however appropriate elsewhere, would be improper in the context of suits under the Civil Rights Act of 1968. A similar conclusion would seem to apply, perforce, to the Civil Rights Act of 1964. Thus, an effort should be made to identify and separate those strands of the prevailing standing doctrine which are rooted in Article III; for once discerned, these elements will govern the resolution of defendant HUD's standing arguments in the instant action.

In *Valley Forge, supra,* the Court noted that

> at an irreducible minimum, Art. III requires the party who invokes the court's authority to "show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant" and the injury

"fairly can be traced to the challenged action" and "is likely to be redressed by a favorable decision."

*Id.* (citations omitted). Following this simple articulation of the constitutional principle of standing, the Court relegated the remaining body of familiar axioms concerning standing to the status of "prudential principles that bear on the question of standing." *Id.* at ——, 102 S.Ct. at 759. Firm reliance on this dichotomy would be unwise, in view of the volatile nature of the doctrine. It may not be said with certainty that the formulation articulated by Justice Rehnquist will endure the tidewaters of the Court's opinions on standing; rather, what Justice Rehnquist denominated as "prudential principles" may, at some time in the future, emerge as having a substantially closer tie to Article III. Hence, certain specific principles which have consistently recurred in the Court's standing decisions, albeit in different linguistic formulations, will be set forth.

In the foreground of this panoply is the statement that

> [t]he "legal interest" test goes to the merits. The question of standing is different. It concerns, apart from the "case" or "controversy" test, the question whether the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee.

*Association of Data Processing Service Org., Inc. v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970). Though the "zone of interest" test of *Camp* represented, in most respects, a broadening of the class of persons who might be deemed proper plaintiffs, the Court, shortly after that decision, pointed out that this extension "is a different matter from abandoning the requirement that a party seeking review must himself have suffered an injury." *Sierra Club v. Morton,* 405 U.S. 727, 738, 92 S.Ct. 1361, 1368, 31 L.Ed.2d 636 (1972). The caution delivered in *Sierra Club v. Morton* signalled the commencement of a process of evolution and refine-

ment, which has largely focused on the question of "injury in fact" or, in other words, the nature of the injury. In *O'Shea v. Littleton*, 414 U.S. 488, 494, 94 S.Ct. 669, 675, 38 L.Ed.2d 674, the Court stressed that "[a]bstract injury is not enough." In *O'Shea*, the Court approved a prior holding that "[i]t must be alleged that the plaintiff 'has sustained or is immediately in danger of sustaining some direct injury' as the result of the challenged statute or official conduct." 414 U.S. at 494, 94 S.Ct. at 675, quoting *Massachusetts v. Mellon*, 262 U.S. 447, 488, 43 S.Ct. 597, 601, 67 L.Ed. 1078 (1923). *See also Linda R. S. v. Richard D., supra*, 410 U.S. at 617, 93 S.Ct. at 1148. Finally, of course, the "injury in fact" requirement has been interpreted to be a barrier against claims which amount to little more than "generalized grievances about the conduct of government." *Flast v. Cohen, supra*, 392 U.S. at 106, 88 S.Ct. at 1956; *see also Schlesinger v. Reservists to Stop the War*, 418 U.S. 208, 225, 94 S.Ct. 2925, 2934, 41 L.Ed.2d 706 (1974); *United States v. Richardson*, 418 U.S. 166, 198, 94 S.Ct. 2940, 2957, 41 L.Ed.2d 678 (1974).

■ The various principles set forth above should be reduced to a more manageable standard. The following matters must be considered: (1) Did the plaintiffs suffer an actual injury that (2) may be traced to the conduct of defendants, which, in turn, (3) was in contravention of a statute designed to protect or regulate a "zone of interest" of the plaintiffs? With these principles articulated, the evaluation of plaintiffs' standing to bring the present action may be conducted.

It should be noted at the outset that "[f]or the purpose of ruling on a motion to dismiss for want of standing . . . the trial . . . court must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Warth v. Seldin*, 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975). The fundamental allegation raised by plaintiffs' complaint is the acquiescence of HUD in the racially discriminatory practices of local suppliers of housing and housing-related services in East Texas. If, in fact, HUD has participated, either actively or passively, in the maintenance of racially segregated housing in East Texas, as alleged in the complaint, then the focus of the standing inquiry is the nature of any injury suffered by plaintiffs as a result of this conduct. Beyond doubt, black residents of East Texas, otherwise eligible for public housing, who are denied such housing because of their race, sustain an injury in fact, one that is in no way abstract. As noted previously, HUD concedes the propriety of a class action by these plaintiffs against the local housing authority of Clarksville (and impliedly Pittsburg). This concession necessarily includes an admission that the allegations of the complaint, if taken as true, constitute an "injury in fact" for the threshold purpose of determining standing.

Similarly, the third part of the three-prong test set forth above is plainly satisfied by plaintiff's complaint in this action. It is beyond doubt that the Civil Rights Act of 1964 and 1968 (Title VI and Title VIII) were enacted to protect and defend the rights of black persons to equal treatment. The sweep of Title VI is broad, and is intended to eradicate discrimination from all forms of social life. The statute explicitly enlists the power of federal funding agencies in this program. Title VIII is narrower, and is more explicitly focused on providing "fair housing" throughout the United States. The legislative history of both statutes makes clear that their purpose is to erase the legacy of racial segregation and discrimination, by equalizing the provision of services to all persons within the jurisdiction of the United States, without regard to color. Plaintiffs are obviously among those persons in whose interests the statutes were passed. The same finding is unconfutable with respect to §§ 1981 and 1982, since these statutes were designed to give direct legal effect to the Thirteenth Amendment. Of course, in broad terms all society benefits from eradication of the badges and incidents of slavery. *Civil Rights Cases*, 109 U.S. 3, 3 S.Ct. 18, 27 L.Ed. 835 (1883). However, if a specific group of

persons were to be identified as being particularly subject to the benefits of these actions, surely black Americans, who seek nothing more than equal access to governmental services, would be that group. Finally, plaintiffs have standing under the Fifth Amendment to raise claims of racial discrimination which contravene the protections of the Equal Protection Clause.

HUD's contention that plaintiffs lack standing to bring this action, then, is focused on the second part of the inquiry, as structured above: whether the injury sustained by plaintiffs may fairly be traced to the conduct of the officials. The core of this argument is that local housing programs are administered under the autonomous direction of local housing authorities without meaningful participation by HUD. Moreover, HUD argues that, even conceding for the moment HUD's culpability with respect to Clarksville and Pittsburg, plaintiffs have no standing to challenge HUD's conduct with respect to the remaining 109 housing projects in East Texas. These arguments fundamentally miss the point of this civil action. Plaintiffs' claim is that HUD's failure to comply with the terms of its affirmative duties created by § 2000d and § 3608(d)(5) violates their statutory rights. These rights are held in common by all residents of East Texas, regardless of the locality of their residence, and irrespective of the particular practices of the local housing authority.

As outlined above, Title VI and Title VIII create an affirmative duty on federal funding agencies to eradicate racial discrimination. Under the terms of traditional legal analysis, the obverse of the legal duty of one person is the creation of a right which inures to the benefit of another person. Terry, *Legal Duties and Rights*, 12 Yale L.J. 185 (1903). Black residents of East Texas are plainly within the class of persons for whose benefit these statutes were enacted. In other words, black residents are vested with a right, by virtue of the statutes, which mandate a form of affirmative action on the part of federal funding agencies. Plaintiffs Young and Wyatt, who reside in Clarksville, enjoy this right on equal terms with plaintiff Helen Ruth Jackson, who resides in Pittsburg. Simply put, all the black persons who might benefit from effective enforcement by HUD of the policies of Title VI and Title VIII are directly injured by the reluctance or indifference of HUD toward the enforcement of their undoubted rights. This injury is related to injuries that might be sustained as the result of the active racially discriminatory housing practices implemented by local housing authorities. However, the disheartening fact that a black resident of a community may be victimized by racial prejudice that operates at two separate levels does not vitiate the right of that person to seek redress from either, or both, forms of discrimination.

An instructive analogy may be drawn to civil actions challenging racial discrimination in education. The saddening legacy of segregation in education has been the target of a long and uneven legal struggle. The goal of this battle is to eliminate the vestiges of segregation, root and branch, from the system of public education. Of necessity, legal remedies have been aimed at trucklers to discrimination at all levels of the governmental hierarchy. Local school boards may be sued for their direct role in maintaining dual school systems. *Swann v. Charlotte Mecklenburg Board of Education*, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971). A state funding education agency charged with affirmatively enforcing standards of racial equality in public education may be properly named as a defendant in a suit challenging a state-wide pattern of segregation. *United States v. State of Texas*, 321 F.Supp. 1043 (E.D.Tex.1970); supplemental opinion, 330 F.Supp. 235 (E.D.Tex. 1971), aff'd with modifications 447 F.2d 441 (5th Cir. 1971) *stay denied sub nom. Edgar v. United States*, 404 U.S. 1206, 92 S.Ct. 8, 30 L.Ed.2d 10, *cert. denied*, 404 U.S. 1016, 92 S.Ct. 675, 30 L.Ed.2d 663 (1972). Finally, the Secretary of the relevant federal agency may be sued for dereliction of the agency's duty to enforce Title VI, by not taking appropriate action to end segregation in public institutions receiving federal funds.

*Adams v. Richardson*, 480 F.2d 1159 (D.C. Cir.1973) (en banc).

The last-named case, *Adams v. Richardson*, is especially illuminating. In that case, a nation-wide class action against the Secretary of Health, Education and Welfare, the court ordered the Secretary of HEW to institute a variety of Title VI compliance actions against state public education agencies. The relief was explicitly predicated on HEW's affirmative obligation under Title VI to eliminate racial discrimination from federally funded programs. The availability of judicial relief against the state agencies, or, alternatively, against the local school boards, in no way compromised the propriety of relief sought in the action against HEW.

HUD acknowledges *Adams v. Richardson* as a relevant decision, and attempts to distinguish it in a footnote in its post-hearing submission. The several points of distinction are singularly unpersuasive. *First*, HUD contends *Adams* was a nation-wide class action, and was not confined to a region; in other words, apparently, the instant action is too narrowly defined. This argument is bizarre, since a large part of HUD's argument has been that the action is too broad.[7] Ultimately, in terms of class certification, these claims implicate the typicality and commonality requirements of Rule 23(a), and do not involve considerations of standing. Once it is established that plaintiffs have a legitimate cause of action against HUD, its argument in this relation is defeated. *Second*, HUD contends that *Adams* is not valid precedent for the present action, because it predates *Warth v. Seldin*, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). *Warth* is wholly inapposite to the present action against HUD. As applied to the claims of plaintiffs here, *Warth* might suggest that the residents of Clarksville could not challenge the discriminatory practices of the local housing authorities of Pittsburg. Conspicuously absent from this analogy is any claim against HUD, the overarching federal authority whose practices commonly affect residents of both towns, regardless of the practices of the local authorities. *Warth* in no way limits the holding of *Adams*, as it relates to the present action against HUD. *Third*, HUD claims that factual circumstances underlying the *Adams* case presented a considerably more monolithic situation, susceptible to direct relief, than exists in this action. Briefly put, HUD argues that in *Adams*, HEW was ordered to begin compliance proceedings against a large number of education systems, all of which were essentially at the same point in terms of legal compliance. On the other hand, HUD contends, the relationships between HUD and the local housing authorities in East Texas are widely variant in form and content. In other words, there has been no uniformity of action or inaction on the part of HUD with respect to the local housing authorities.

7. HUD's contentions in this relation have been extremely idiosyncratic. HUD has maintained that the action is too broad, in that it is not confined to one local housing authority; that the action is too narrow, because it is not nation-wide; and that it is too narrow, because it does not conform to a particular geographical region of HUD. Only the last of these three arguments merits response. There is no reason that plaintiffs should be compelled to fashion their action in a manner that coincides with the administrative convenience of HUD. The proper scope of the action is to be governed by two considerations: the requirements of Rule 23 concerning commonality and typicality; and the nature of any relief to be granted. Though no arguments in this relation have been made, it might be true, for instance, that the structure of the housing market varies so substantially within the so-called "Region VI" of HUD that a class action concerning that entire region might be impracticable under the terms of Rule 23(a). For example, as the area of school desegregation has made clear, what constitutes racial identifiability is heavily contingent on the demographical patterns of the area. It seems plain that the problems of South Texas with respect to federally-assisted housing differ markedly from those of East Texas. In any event, the nature of the plaintiff class is the central determinant of the proper scope of the class action. Of course, a court retains plenary power to supervise the litigation of the class action, to insure the interests of the class are protected. *Johnson v. Uncle Ben's, Inc.*, 628 F.2d 419 (5th Cir. 1981), *vacated on other grounds*, 451 U.S. 902, 101 S.Ct. 1967, 68 L.Ed.2d 290 (1981).

This argument is factually incorrect as it interprets the *Adams* decision, and irrelevant as well, in relation to the present action. Actually, the situation presented in *Adams* involved a wide variety of local problems; the injunction entered in that case required HEW to begin action, at a number of different points in the compliance process, depending on the status of local efforts at integration and a number of other variants. 480 F.2d at 1161. The significance of *Adams* is that the plaintiffs were permitted to secure injunctive relief against HEW, for its failure to pursue its affirmative obligation to eradicate segregation. The structure of an equitable remedy is dictated by the nature of the violation, in accordance with orthodox principles of equity. It may be true, as HUD alleges, that the nature of HUD's action or inaction with respect to local housing situations will vary widely. This is obviously a factual issue properly resolved after trial. The crucial point is that this action challenges *HUD*, not the local housing authorities; relief against HUD will be tailored to the nature and scope of the violation, if any. Simply stated, HUD cannot escape liability merely by claiming that its alleged derelictions lack consistency.

Plaintiffs' complaint satisfies the fundamental requirements of Article III; plaintiffs have alleged an injury in fact, which was caused by action of defendants, in contravention of statutes (and constitutional provisions) designed to protect and defend the rights of a class of persons to which plaintiffs belong. Thus, as a threshold matter, plaintiffs have standing to bring this action against HUD. This discussion has been extensive, because of the confusion generated by the parties' submissions in this relation. Essentially, the question is simple; whether the action is properly maintained against HUD for its action or inaction with respect to public housing in East Texas. Not all of the confusion may properly be traced to defendants' repeated arguments concerning the practices of local housing authorities. As noted, plaintiffs' complaint names the local authorities of Clarksville and Pittsburg as defendants, as well as HUD. This joint action is logically untenable, in view of the nature of the class action against HUD, for its practices in East Texas.

Residents of Clarksville obviously have standing to raise a claim, on behalf of all residents of that town, against the practices of the housing authority of Clarksville. Hence, plaintiffs Young and Wyatt may properly bring a civil action against the Clarksville Housing Authority, for maintenance of racially discriminatory public housing. Similarly, plaintiff Jackson may bring an action against the Pittsburg Housing Authority, for its allegedly illegal housing practices. Moreover, as here analyzed, all three of these persons may bring a civil action challenging the practices of HUD, with respect to the respective areas of their residence.[8] As an initial matter, plaintiffs are at liberty to define the geographical scope of their cause of action.

Here, confusion is generated because these actions are combined into one civil action. Plaintiffs Young and Wyatt do not have standing to challenge the practices of the Pittsburg Housing Authority directly, except insofar as they may demonstrate direct injury *to themselves* as a result of those practices. Correspondingly, Jackson cannot challenge the purely local actions of the Clarksville Housing Authority, except under the same conditions. These limitations are plainly entailed in the holding in *Warth v. Seldin, supra,* and the general tenets of the doctrine of standing. It is apodictic that persons may not gain standing to sue a certain defendant merely by joining that defendant in a lawsuit against an entity which may properly be sued. Standing to sue is a particularized consideration, based on the relationship between the specific plaintiff and the specific defendant. The threshold requirements must be satis-

---

8. Again, it should be stressed that this discussion concerns standing to bring an action; the propriety of a class action of this nature additionally is contingent on the requirements of Rule 23; most particularly here, the prerequisites of commonality and typicality.

fied in each instance; otherwise, the action with respect to that defendant must fail.

Logically, then, the action as presently structured encompasses three separate civil actions: *Young, Wyatt, et al. v. Clarksville Housing Authority; Jackson, et al. v. Pittsburg Housing Authority*; and *Young, Wyatt, Jackson, et al. v. HUD.* Each of these actions is maintainable separately. In combination, they present insurmountable hurdles, both jurisdictional and pragmatic. Reason dictates they should be severed. Rule 21, F.R.CIV.P. provides:

> Misjoinder of parties is not ground for dismissal of an action. Parties may be dropped or added by order of the court ... of its own initiative at any stage of the action and on such terms as are just. Any claim against a party may be severed and proceeded with separately.

Severance of claims is particularly appropriate when, by so doing, the nature of the actions in question is substantially clarified and the interests of the parties are thereby served. The interests of the plaintiffs are clearly advanced, by maintaining their action against HUD separate and apart from their several actions against the local housing authorities. Further, it is to the advantage of HUD that the discrete action against it does not require that it be held responsible for the autonomous actions of local housing authorities. Similarly, it is to the benefit of the local authorities to permit them to defend their actions individually, without the implication of HUD's actions under Title VI and VIII. It follows that the claims should be severed. Severance does not necessarily entail separate trials; the actions may be consolidated for trial, pursuant to Rule 42(a), even after severance, should it appear that such consolidation is warranted. *Kenvin v. Newburger, Loeb & Co.,* 37 F.R.D. 473, 475 (S.D.N.Y. 1965).

This procedural device is required by the demands of the rules governing class actions. Those rules will be examined at length below, with respect to the maintainability of this action as a class action. Insofar as this action is against HUD for its acquiescence in racially discriminatory housing in East Texas, the named plaintiffs seek to represent a class of black residents in thirty-six East Texas counties, who are applicants for residence, or who are residents of, HUD-assisted rental housing projects which are one-race in composition or are racially identifiable. The viability of this class will be scrutinized. It is obvious that only portions of this putative class have standing to challenge the practices of any particular local housing authority. In this regard, the identification of sub-classes appears to be a proper course of action. This expedient is peculiarly appropriate as a means of solving potential conflicts within the class, and it serves to avoid such basic jurisdictional problems as lack of standing. The severance of these claims, with the potential for joint trial, likens this action to a large class action, in which certain subclasses have been denominated. By way of analogy, the large class would consist of the residents of the thirty-six East Texas counties who are challenging HUD's enforcement practices with respect to this area; and within this broad class would be subclasses, defined by their place of residence, who might legitimately challenge the practices of the local housing authority. The local authorities of Clarksville and Pittsburg have been named; other local authorities might be challenged. Alternatively, of course, HUD might choose to bring in the local authorities as third-party defendants in this action, pursuant to their claim that these entities, rather than HUD, are properly responsible for the maintenance of racially discriminatory housing in East Texas.

In any event, the class analysis will proceed with an examination of the class seeking to challenge HUD's practices in the area denominated by plaintiffs as East Texas. Before this analysis is undertaken, the nature of HUD's participation in the provision of federally assisted housing should be set forth, so that the nature of HUD's involvement in any alleged discrimination may be clarified.

HUD does not construct, own, or operate any housing on its own; rather, its role is

essentially promotional, through financial support, technical assistance, and regulatory oversight. Within this promotional role, of course, HUD is directed to implement the types of affirmative programs mentioned previously, as a means of fulfilling its mandate to eliminate racial discrimination in housing. Three different programs of HUD participation in local housing facilities are implicated by plaintiffs' action: public housing, rent supplement programs, and Section 8 housing. These programs involve different methods of financing; therefore, the nature of the relationship between HUD and the local housing authority in question varies according to the kind of program administered by HUD.

### 1. Public housing

Under the Housing Act of 1937, as amended, 42 U.S.C. § 1437, *et seq.*, HUD is authorized to make loans and annual contributions to public housing agencies, to enable these agencies to develop, operate, and maintain low-income public housing projects. Under the Act, the local housing authority which receives HUD assistance may be a creation of any governmental entity authorized to provide low-income housing, provided the authority is sanctioned by the governmental body. The housing units are owned by the local housing authority, which finances the construction costs through tax-exempt bonds. HUD guarantees repayment of the bonds through annual contributions to the authority. This financial assistance is contingent on local compliance with HUD regulations promulgated to enforce the objectives of Title VI. In substance, the regulations seek to assure non-discrimination in public housing, by requiring the local authorities to adopt tenant-selection and tenant-assignment plans consistent with the basic principle of racial equality. *See* 24 C.F.R. § 860.203; *e.g.*, 24 C.F.R. § 1.4(b)(2)(ii). Specifically, HUD's involvement with local housing authorities providing public housing pursuant to the Housing Act of 1937 includes HUD approval of tenant selection and assignment plans, site-selection, affirmative fair housing mar-

keting programs for new projects, and Title VI compliance reviews. *See* 24 C.F.R. § 200.600, *et seq.* (fair housing marketing), and § 841.202 (site and neighborhood selection).

### 2. Rent-supplement

The HUD rent-supplement program was established as part of the Housing and Urban Development Act of 1965, 12 U.S.C. § 1701s, essentially to assist failing multi-family rental projects, through the provision of Federal Housing Administration mortgages. The program was suspended in 1973, and replaced by the Section 8 program, 42 U.S.C. § 1437f. However, HUD continues to pay rent supplements under existing contracts. The rent-supplement program authorized HUD to contract with eligible owners of housing to make annual payments, supplemental of rent payments by qualified tenants. 12 U.S.C. § 1701s; 24 C.F.R. Part 215. Participation in the rent-supplement program was conditioned on local governmental approval, similar to that required for public housing. 24 C.F.R. § 215.15(c)(2). Though local housing owners are not required to file, for HUD's approval, specific tenant selection procedures, the owner's discretion in tenant selection must be exercised consistently with HUD's regulations, which prohibit racial discrimination. *E.g.*, 24 C.F.R. §§ 1.4(a), (b)(1). Moreover, HUD is empowered to review and approve or disapprove the owner's affirmative fair housing marketing program. 24 C.F.R. § 200.600, *et seq.*

### 3. Section 8 Housing

The Housing Act of 1937 was amended in 1974 by the Housing and Community Development Act. Among the amendments is Section 8, 42 U.S.C. § 1437f, which provides housing assistance payments for low income families occupying new, substantially rehabilitated, or existing units. Unlike the previous two programs, no cooperation agreement between the housing provider and a local governmental authority is required. Under Section 8 "Existing Housing" programs, HUD is authorized to make annual

contributions to housing authorities, who, in turn, may contract with specific housing owners to provide rental housing to low income families. 24 C.F.R. Part 882. In its application to HUD for financial assistance, the local housing authority is required to submit an equal opportunity housing plan. 24 C.F.R. § 882.204.

Under Section 8 "New Construction/Substantially Rehabilitated Units" programs, HUD may make financial assistance payments to owners, prospective owners, or local housing authorities who intend to provide housing for families eligible for Section 8 housing. 24 C.F.R. Parts 880–881. With limited exceptions, proposed sites for new construction of Section 8 housing will not be approved by HUD, if the site will have the effect of contravening the goal of equal housing, by increasing minority concentration in a particular area. 24 C.F.R. §§ 880.206, 881.206. The owner is required to undertake affirmative fair housing marketing programs to attract renters of all racial groups. 24 C.F.R. §§ 880.601, 881.-601. Tenant selection is governed by the general principle of non-discrimination, embodied in Title VI and the accompanying regulations. *See* 24 C.F.R. §§ 1.4(a), (b)(1).

Thus, HUD is bound by its own regulations to implement the objectives of Title VI and Title VIII, as well as the general constitutional principle of equal protection of the laws. In this action, plaintiffs charge HUD has wholly abrogated these affirmative duties in East Texas. The action is brought as a class action, on behalf of black residents of East Texas eligible for federally assisted housing and denied the benefits of such housing, in part because of the inaction of HUD.

### III.

### MAINTAINABILITY AS A CLASS ACTION

Upon motion for class certification, Rule 23, F.R.CIV.P., requires that a determination be made as to whether the civil action is properly maintainable as a class action. As noted, a hearing for this purpose was held on October 30, 1981. On the basis of the evidence adduced at that hearing and in the supplemental submissions by the parties, it has been determined that the plaintiff class in this action meets the requirements set forth in Rule 23, and should be certified as a class, for purposes of the action against HUD.

This action involves a broad-gauged challenge to the policies and practices of HUD, with respect to enforcement of the anti-discrimination principles of Title VI and VIII. HUD has registered several arguments against certification, which may be traced ultimately to the scope of plaintiffs' claim. For example, HUD has argued that the very breadth of the complaint, coupled with the possibility that HUD's response to any local problem might vary greatly, confutes the attempt of plaintiffs to bring this as a class action. These arguments will be addressed under the relevant headings of commonality and typicality. Insofar as the arguments of HUD bear more directly on the propriety of this action as a class action, they have been resolved by the foregoing discussions regarding the existence of a private right of action and the standing of plaintiffs to bring the action. In view of those threshold discussions, the requirements of Rule 23(a) will be addressed serially.

#### A. Numerosity

 The requirement of numerosity is not to be resolved on the basis of an arbitrary numerical calculation, but, rather, with reference to the particular circumstances of the action. *General Telephone Co. of the Northwest, Inc. v. EEOC*, 446 U.S. 318, 330, 100 S.Ct. 1698, 1706, 64 L.Ed.2d 319 (1980). For purposes of establishing numerosity, smaller classes are more readily certified when the relief sought is injunctive relief, the benefits of which would inure not only to the known class, but also to a future class of indefinite size. *Jones v. Diamond*, 519 F.2d 1090, 1100 (5th Cir. 1975). *See* Rule 23(b)(2). Properly considered, the plaintiff class should include these unknown future class members. Of

course, joinder of such persons is inherently impracticable. *Jack v. American Linen Service*, 498 F.2d 122, 124 (5th Cir. 1974). *See also Adams v. Jefferson Davis Parish School Board*, 76 F.R.D. 621, 622 (W.D.La. 1977).

As already stated, plaintiffs seek to represent a class of black applicants for, and residents of, racially identifiable HUD-assisted housing in thirty-six East Texas counties. This putative class thus includes persons in two different positions: one group who are eligible for publicly-assisted housing and who currently reside in such housing; and another group of persons who are eligible for the housing, who have applied for it, and who are currently on a waiting list. Uncontested evidence presented by plaintiffs, derived from HUD reports for 1980, indicate the following estimated numbers for the putative class:

> 2,292 black households, residing in public housing projects that have one or more one-race or racially identifiable sites.
>
> 3,018 black households, residing in HUD Insured/Rent Supplement projects that are one-race or racially identifiable.
>
> 156 black households, residing in HUD Section 8 New Construction or Substantial Rehabilitation Projects that are one-race or racially identifiable.

Thus, approximately 5,466 black households presently occupy rental housing which is of one race or is racially identifiable. HUD does not maintain, nor have available to it, figures indicating the number of black households presently on waiting lists for the various HUD-assisted housing projects in East Texas. Plaintiffs submitted data indicating that there are 35,080 black households in East Texas eligible for, and in need of, HUD assisted rental housing. Given that 5,466 of these households currently reside in such housing, roughly 29,614 households remain eligible for, yet currently do not reside in public housing. Clearly not all these households are presently on the waiting lists for HUD-assisted housing; however, this figure provides some indication of the magnitude of the potential class which would benefit from any injunctive relief granted as a result of this action.

Comparison of the number of actual and potential class members in this action with the size of other classes certified in actions challenging discriminatory housing practices renders inescapable the conclusion that plaintiffs in this action have satisfied the requirement of numerosity. *E.g., Drake v. Crouch*, 377 F.Supp. 722 (M.D.Tenn.1971), *aff'd* 471 F.2d 653 (6th Cir. 1972); *Ross v. Community Serv., Inc.*, 396 F.Supp. 278, 282 (D.Md.1975), *aff'd* 544 F.2d 514 (4th Cir. 1976).

### B. Commonality

Rule 23(a)(2) requires that there be questions of law or fact common to the class. On its face, the rule does not mandate absolute commonality, in the sense of identity; nor does the rule require common questions of law *and* fact. The language of the rule is disjunctive. Factual differences among the claims of members of the class are not fatal, if common questions of law exist. *Like v. Carter*, 448 F.2d 798 (8th Cir. 1971), *cert. denied*, 405 U.S. 1045, 92 S.Ct. 1309, 31 L.Ed.2d 588 (1972). Generally, the approach of courts to the commonality issue has been flexible. The requirement is generally considered satisfied, if the common questions raised by the factual and legal matters in the action predominate over any differences or variations which might exist. *E.g., Doe v. First City Bancorporation of Texas, Inc.*, 81 F.R.D. 562 (S.D.Tex.1978).

Plaintiffs here allege common questions of law *and* fact. Initially, the common question of law is asserted to be whether HUD's action or inaction with respect to its alleged acquiescence in the maintenance of racially discriminatory housing in East Texas violates its duties under the Constitution, Title VI or Title VIII. Next, plaintiffs maintain that there are at least two common questions of fact: (a) whether HUD knowingly funds housing which is racially discriminatory; and (b) what steps HUD has taken to enforce the constitutional and

statutory mandates that racial discrimination in housing be eliminated.

HUD contends flatly that "there are *no* questions of law or fact common to" the putative class. In substance, HUD's claim in this relation is that the local housing authorities operate autonomously; the authorities are not united by any cognizable organizational entity, whether within East Texas or within HUD's organizational scheme. Moreover, since the projects implicated in this action include public housing projects, rent supplement programs, and Section 8 housing, HUD's involvement is of a widely varying character, which assertedly disproves any allegations of commonality. HUD further argues that HUD's compliance efforts are contingent on local circumstances, and, therefore, may not be assessed in a uniform review such as would be required by the instant action.

These arguments have been addressed above, in the section concerning standing. The possibility, even the probability, that HUD's action with respect to housing authorities in East Texas will vary greatly from locality to locality does not undermine the legitimacy of a class challenge to HUD's behavior. A useful analogy here is to "across the board" class actions brought under Title VII, challenging racial discrimination in employment. The Court of Appeals for the Fifth Circuit has plainly held that plaintiffs may challenge the employment actions of a company, at all levels of employment, even if the named plaintiff has been victimized by only one element of the policy. *Johnson v. Georgia Highway*

*Express*, 417 F.2d 1122 (1969); *Phillips v. Joint Legislative Committee, etc.*, 637 F.2d 1014, 1024 (5th Cir. 1981) (affirming the vitality of *Johnson*). In explanation, a person who allegedly has been terminated on the basis of race may represent all persons affected by the employer's allegedly discriminatory practices, including persons who have not been promoted, who have been underpaid, or who have been discharged, all on the basis of race. The obvious fact that the actual pattern of personnel decisions in any of these areas is likely to differ does not defeat the claim of commonality. Indeed, the "across the board" doctrine has been extended to permit a challenge to the hiring practices of a central corporation, even though the local facilities make essentially autonomous decisions. *Doe v. First City Bancorporation of Texas, supra* ("general policies [may] override local autonomy", 81 F.R.D. at 567). In a simplified sense, "across the board" class actions are approved under Rule 23 because, among other things, there is present in the claims either a common question of fact or law, or both fact and law,[9] that is, the existence *vel non* of illegal racial discrimination in the employment practices of the defendant employer. The inevitable variations in the factual underpinnings of the claims of individual class members do not invalidate the class.

HUD's mandate under Title VI and Title VIII is plain. The agency has developed several programs by which the ultimate goal of elimination of discrimination in housing may be achieved; moreover, this

9. The phrase used here, "a common question of fact and/or law" is admittedly ambiguous. The ambiguity is the result of a recent Supreme Court decision concerning the nature of final determinations made by a trial court in actions challenging employment discrimination under Title VII. In *Pullman-Standard v. Swint,* —— U.S. ——, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982), the Court held that a trial court's finding with respect to discriminatory intent was a "pure question of fact." At ——, 102 S.Ct. at 1789. The effect of this holding is not plain. It seems clear that a conclusion by a trial court that HUD had violated § 2000d, § 3608, or the Con-

stitution in its actions with respect to housing would be a conclusion of law. The component parts of such a conclusion, concerning the specific action or inaction, and also the effect and intent of HUD's behavior, would seem to be factual findings. Beyond this simple polarity, the import of the Court's decision in *Swint* is not discernible. However, in view of the present discussion, the matter need not be resolved presently. It is sufficient to say that the basic claims of the named plaintiffs share a high degree of commonality with those of the class generally.

variety of programs plainly share that common purpose. Not only do the broad directives of the statutes in question designate this singular purpose, but the accompanying regulations are explicitly aimed at effectuating the provisions of the statutes. *E.g.*, 24 C.F.R. §§ 1.1, 1.4(a), 1.4(b)(1). Whether HUD has violated the law, by abrogating its affirmative duties and thereby funding racially discriminatory housing projects in East Texas, is a common question of law in this action; indeed, in a crucial sense, that question is *the* issue in this action. The form of this alleged acquiescence may vary, but its central import is uniform, regardless of the local housing authority with which HUD works, and irrespective of the particular funding program involved.[10] In many respects, commonality of this nature involves parallel, substantially overlapping considerations, such as are involved in the inquiry required under Rule 23(a)(2) for class actions of this nature: *i.e.*, whether "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." *See Vernon J. Rockler & Co. v. Graphic Enterprises, Inc.*, 52 F.R.D. 335 (D.Minn.1971).[11] The named plaintiffs in this action claim HUD has knowingly funded racially discriminatory housing in Clarksville and Pittsburg; these assertions have in common with the claims of the class generally the basic question of

law concerning HUD's adherence to its affirmative duty. The requirement of Rule 23(a)(2) is satisfied.

### C. Typicality

Rule 23 also requires that the claims of the named plaintiffs be typical of the claims of the class as a whole. Simply put, this provision requires that the claims of the plaintiffs at once be established by factual allegations concerning their own experience, and also be typical of the individualized claims of the other class members. Typicality of course, does not mean identity, but rather a broader form of congruity. *See Herbert v. Monsanto Company*, 576 F.2d 77 (5th Cir. 1978), *vacated on other grounds* 580 F.2d 178 (5th Cir. 1978); *Leisner v. New York Tel. Co.*, 358 F.Supp. 359 (S.D.N.Y.1973). The claims of plaintiffs Young, Wyatt and Jackson are typical of the claims of the class as a whole. The basic claim is identical: HUD has knowingly acquiesced in the maintenance of racially discriminatory housing facilities in East Texas. More particularly, the claims of the plaintiffs are typical, in the specific factual content of the allegations. Young and Wyatt claim they are eligible for, and desirous of, HUD-assisted housing in Clarksville; Jackson claims she is in a similar position with respect to Pittsburg. Young and Wyatt are on a waiting list for housing in Clarksville.[12] Jackson is presently awaiting placement in a housing unit in Pittsburg,

---

**10.** HUD has argued strenuously that this class action is not properly maintainable because HUD's involvement in housing programs is likely to vary greatly from town to town. HUD cites two major reasons for these alleged variations: the different programs involved, and the likelihood that HUD efforts to monitor compliance with Title VI will be at different stages. Neither of these arguments have merit. *See* pp. 1030–1031, (variations in programs), and pp. 1024–1025 (different stages of compliance monitoring).

**11.** HUD has argued that class certification is not necessary, because the benefits of any injunctive relief against HUD would inure to all residents of the effected area, even in the absence of class certification. This argument is

frivolous, in that it seems flatly to contradict the explicit provisions of Rule 23(b)(2), rendering cases involving injunctive relief for the class specifically appropriate for class certification.

**12.** HUD has contended that plaintiff Wyatt is not a suitable class representative because she no longer lives in Clarksville. At the class certification hearing, counsel for the plaintiff class represented that Ms. Wyatt moved out of Clarksville as a matter of desperation, because she could not find housing within that city. No factual finding in this relation may be made at this time; for present purposes, it is sufficient that Wyatt resides in East Texas, and apparently is eligible for, and has applied for, HUD assisted housing.

pursuant to an alleged agreement that she will be provided a unit as quickly as possible. Even if Jackson were to obtain housing in Pittsburg, her claim against HUD would not be rendered moot. *Trafficante v. Metropolitan Life Insurance Co., supra,* plainly establishes that residents of racially discriminatory housing projects, as well as persons denied residence as a result of the discrimination, have legitimate claims against the alleged discrimination. 409 U.S. at 208–212, 93 S.Ct. at 366–368.

Thus, the positions of the three plaintiffs in their efforts to secure HUD-assisted housing in East Texas are typical of the claims of the class as a whole; each named plaintiff, like each member of the putative class, has allegedly been deprived of the opportunity to reside in HUD-assisted housing which is free from the taint of racial discrimination. Though HUD's responses to local housing practices in the specific localities of the named plaintiffs' residences may be different in degree from its response in other East Texas communities, the fundamental claims of the named plaintiffs are typical of the claims of the entire class. Hence, Rule 23(a)(3) has been satisfied.

### D. Adequacy of Representation

The requirement that plaintiffs fairly and adequately represent the interests of the entire class involves two considerations. The first requirement is that the attorneys representing the class must be capable of zealously protecting the interests of the class. The court is familiar with the abilities of the attorneys representing the plaintiff class and is well satisfied that they will conscientiously and competently handle all phases of this action. The rule also requires that the named plaintiffs adequately assert and support the legal claims which form the basis of the civil action. In part, this rule mandates that the interests of the named plaintiffs coincide with those of the class as a whole. In large measure, this matter overlaps with the commonality and typicality requirements, discussed above. Beyond that, it is necessary that the interests of plaintiffs in remedial relief not conflict with other members of the incipient class in any respect. *Gonzales v. Cassidy,* 474 F.2d 67 (5th Cir. 1973). All plaintiffs here have a uniform interest in the elimination of racially discriminatory housing from East Texas, and, specifically, in permanently enjoining HUD's participation in such housing. Should such relief be granted, the benefits would inure to the entire class, under the general principle undergirding the Supreme Court's decisions mandating an end to the maintenance of dual public service facilities. *See, e.g., Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954). Should conflicts in the specific effect or content of any remedial orders develop, in view of the limited availability of housing, such conflicts might appropriately be resolved by the use of sub-classes. *See Oatis v. Crown Zellerbach,* 398 F.2d 496 (5th Cir. 1968); *Johnson v. Uncle Ben's, Inc.,* 628 F.2d 419 (5th Cir. 1980), *vacated on other grounds,* 451 U.S. 902, 101 S.Ct. 1967, 68 L.Ed.2d 290 (1981). Defendants have made no substantive argument on standing, as it concerns the possibility of conflict among the class. The presence or possibility of such a fatal conflict does not appear at this time. Accordingly, plaintiffs and their counsel have satisfied the requirements concerning adequacy of representation.

### E. Relief generally applicable to the class

Apart from the requirement that any potential class satisfy each of the four portions of Rule 23(a), the Federal Rules additionally require that the class satisfy at least one of the three sub-sections of Rule 23(b). Plaintiffs in this action assert that their action meets the test of Rule 23(b)(2). This section provides that "[a]n action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition . . . :

the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.

In this action, the plaintiff class charges that HUD has failed to take the required affirmative steps to enforce the anti-discrimination principles of Title VI and Title VIII. Though the action or inaction of HUD with respect to a given locality may vary, the claims of the plaintiff class against HUD are essentially unified. The challenged acts or inaction of HUD apply, as a broad matter, to the full class, and not merely to isolated residents of East Texas. This pattern of conduct on the part of HUD renders the action maintainable as a class action under Rule 23(b)(2). *See Bing v. Roadway Express, Inc.*, 485 F.2d 441, 447 (5th Cir. 1973); *Rowe v. General Motors Corporation*, 457 F.2d 348, 359 n. 24 (5th Cir. 1972). *See also* Advisory Committee Notes to Rule 23, 39 F.R.D., at 102. ("Illustrative [of Rule 23(b)(2) actions] are various actions ... where a party is charged with discriminating unlawfully against a class, usually one whose members are incapable of specific enumeration.").

On the basis of the foregoing, this action may properly be maintained as a class action. As noted previously, the challenges lodged by HUD to certification of the class have been made in a variety of circumstances. Resolution of the issue of maintainability of the class action also dispenses with the arguments raised in defendant HUD's Motion for Reconsideration. (*See, supra,* pp. 1012–1013.) In accordance with the foregoing, it is

ORDERED that this civil action may be maintained as a class action, pursuant to Rule 23(b)(2), F.R.Civ.P. It is further

ORDERED that the plaintiff class shall consist of all black applicants for, and residents of, HUD-assisted housing in the thirty-six East Texas counties enumerated herein. It is further

ORDERED that defendant HUD's Motion for Reconsideration of the court's order of May 12, 1980, is hereby DENIED. It is further

ORDERED that plaintiff's Motion For Leave to File First Amended Complaint is GRANTED. It is further

ORDERED that the Motion of Mae Lee and Charlie Davis to intervene as plaintiffs in this civil action is DENIED. It is further

ORDERED that the actions of plaintiff class against the Clarksville Housing Authority and the Pittsburg Housing Authority shall be, and they are hereby, SEVERED from the action against the Department of Housing and Urban Development; and it is further

ORDERED that such severed actions be assigned separate numbers, but that each be retained on the docket of the undersigned judge.